## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAWN TARDIBUONO-QUIGLEY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HSBC MORTGAGE CORPORATION (USA), HSBC BANK USA, N.A., PHH CORPORATION, and PHH MORTGAGE CORPORATION,<br><br>Defendants. | Case No. 7:15-cv-6940<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Dawn Tardibuono-Quigley by and through her attorneys Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for her class action complaint, alleges, with personal knowledge as to her own actions, and upon information and belief as to those of others, as follows:

### <u>NATURE OF THE ACTION</u>

1.     This  action seeks to redress the fraudulent practices committed by HSBC Mortgage Corporation (USA) ("HSBC Mortgage"), HSBC Bank USA, N.A. ("HSBC Bank"), PHH Corporation ("PHH"), and PHH Mortgage Corporation ("PHH Mortgage") (collectively, "Defendants") in connection with their home mortgage loan servicing businesses.  Taking advantage of the economic downturn and the increasing number of loans in default, HSBC Mortgage and PHH Mortgage (collectively, "Mortgage Defendants") service home loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments.  Consistent with these practices, Mortgage Defendants use automated mortgage loan management systems and an enterprise that is comprised of  third-party

"property preservation" vendors and Mortgage Defendants' subsidiaries, inter-company departments, and divisions, to engage in a scheme to conceal the unlawful assessment of unnecessary and unauthorized fees for default-related services, cheating borrowers who can least afford it.

2.   Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, however, through relatively recent mortgage industry practices, such as securitization and the sale of mortgage backed securities, that is often not the case.  In today's market, loans and the rights to service them are bought and sold at will, sometimes multiple times over.  As a result, a borrower's relationship is typically with the mortgage servicer, like Mortgage Defendants, rather than the lender who originated the loan.

3.   Mortgage servicers like Defendants do not profit directly from interest payments made by borrowers.  Thus, rather than ensuring that borrowers stay current on their loans, Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service.  According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[1]

4.   When borrowers go into default and Defendants unilaterally decide to instruct third parties to perform default-related services, borrowers have no ability to prevent such services.

---

[1] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Mar. 19, 2015).

5.      Taking advantage of these circumstances, Defendants formed an enterprise with their respective subsidiaries, affiliates, and "property preservation" vendors.  The purpose if this enterprise is to institute a uniform practice of assessing fees for unnecessary property inspections and Broker Price Opinions ("BPOs") against borrowers' accounts, rather than against the accounts of the lenders and/or investors for whom they service these accounts or absorbing the costs themselves.

6.      Defendants are aware that it is improper to assess fees on borrowers' accounts for unnecessary property inspections and BPOs. Therefore, Mortgage Defendants fraudulently conceal these fees on borrowers' accounts by identifying them with cryptic descriptions, such as "New Fees and Charges," "Other Fees," or "Assessed Expenses."

7.      Indeed, Defendants' practices are designed to avoid detection even when examined in bankruptcy proceedings.  As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time."[2]  "[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."[3]

8.      The rampant abuses by mortgage servicers have led federal regulators to enter into numerous Consent Orders, but according to Mark Pearce, the Director of the Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large

---

[2] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

[3] *Id*. at 851 (emphasis added).

3

institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process.  Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward."[4] Moreover, the Consent Orders do not reach the conduct at issue here.

9.     Plaintiff brings this action seeking injunctive relief and damages on behalf of herself and the hundreds of thousands or millions of borrowers who have been victimized by the Defendants' uniform schemes.

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

11.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1367, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.  Diversity of jurisdiction is also conferred over this class action pursuant to the Class Action Fairness Act of 2005 ("CAFA").

---

[4] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, *Mortgage Servicing: An Examination of the Role of Federal Regulators in Settlement Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services, U.S. House of Representatives, July 7, 2011, available at http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Mar. 19, 2015).

12.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District and because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District.

### PARTIES

13.     Plaintiff Dawn Tardibuono-Quigley is an individual and a citizen of New York. Mrs. Tardibuono-Quigley resides in New Rochelle, New York.

14.     Defendant HSBC Mortgage Corporation (USA) operates as a mortgage lender, originator, and servicer in the United States and the District of Columbia.  HSBC Mortgage is a Delaware corporation with its principal place of business in Depew, New York.   Upon information and belief, HSBC Mortgage operates as a wholly owned subsidiary and the primary mortgage unit of HSBC Bank USA, N.A.

15.     HSBC Bank USA, N.A. is a Virginia corporation with its principal place of business in Buffalo, New York.  HSBC Bank is the principal subsidiary of HSBC USA, Inc., an indirect, wholly owned subsidiary of HSBC North America Holdings, Inc., one of the nation's largest bank holding companies by assets.

16.     PHH Corporation operates as a mortgage banking service provider including originating, purchasing, selling and servicing mortgage loans through its wholly owned subsidiary, PHH Mortgage Corporation.  PHH is a New Jersey corporation with its principal place of business in Mount Laurel, New Jersey.

17.     PHH Mortgage Corporation operates as a wholly owed subsidiary of PHH Corporation and provides mortgage services including private-label mortgage services to financial institutions and real estate brokers.  PHH Mortgage is a corporation organized and

existing under the laws of New Jersey, with its principal place of business located in Mount Laurel, New Jersey.

18.     In or about 2012, HSBC Bank entered into a strategic relationship with PHH Mortgage to manage HSBC's mortgage processing and servicing operations. Under the terms of the agreement, PHH Mortgage provides HSBC with mortgage origination processing services as well as sub-servicing of the bank's prime mortgage loan portfolio and for other portfolios.[5]

19.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

20.     PHH exercised, and exercises, specific and financial control over the operations of PHH Mortgage, and it dictates, and dictated, the policies and practices of PHH Mortgage. PHH also exercises power and control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of the ill-gotten gains described herein. The fraudulent scheme at issue in this case was organized by executives working at the highest levels of PHH and PHH Mortgage and carried out by both executives and subordinate employees working for PHH and PHH Mortgage.

21.     HSBC Bank exercised, and exercises, specific and financial control over the operations of HSBC Mortgage, and it dictates, and dictated, the policies and practices of HSBC Mortgage, HSBC Bank also exercises power and control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of the ill-gotten gains described herein. The

---

[5] *See* http://www.us.hsbc.com/1/2/home/about/press-room/2012/news_05072012_hsbcmortgage_phhmortgage (last visited Mar. 18, 2015).

fraudulent scheme at issue in this case was organized by executives working at the highest levels of HSBC Bank and HSBC Mortgage and carried out by both executives and subordinate employees working for HSBC Bank and HSBC Mortgage.

## FACTUAL BACKGROUND

22.     America's lending industry has divorced itself from the borrowers it once served.

23.     Among other things, securitization has created an industry of companies in the lending industry who no longer make money primarily from interest on the loans they originate. Thus, lenders no longer have the financial interest in the repayment of loans that they once did. Instead, financial institutions, through their network of subsidiaries, operating entities and divisions, service or administer mortgages for hedge funds and investment houses who own the loans.   Rather than earn income from the interest on these loans, financial institutions like Mortgage Defendants are paid a fee for their loan administration services.

24.     Additionally, under agreements with investors (pooling and service agreements), loan servicers like Mortgage Defendants assess fees on borrowers' accounts for default-related services in connection with their administration of borrowers' loans.   These fees include Broker's Price Opinion fees, appraisal fees, and property inspection fees.  Mortgage Defendants' collection of these fees, however, exemplifies how America's lending industry has run off the rails.

25.     As one Member of the Board of Governors of the Federal Reserve System has explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad

grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[6]

26.     For financial institutions like HSBC Bank and PHH, who are determined to maximize the money they earn from loans serviced by HSBC Mortgage and PHH Mortgage, the right to charge third party fees has opened the door to a world of exploitation.  As a result of the disassociation between loan servicers and the monies generated from the interest borrowers pay on their loans, Defendants have been incentivized to find other ways to grow their profits.

27.     Defendants, with their subsidiaries, affiliated companies, intercompany divisions, and third-party "property preservation" vendors, each formed an unlawful enterprise and decided to game the system.

28.     In short, as explained by Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers' business model also encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced expenses at inflated prices."[7]

### MORTGAGE DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES

29.     To maximize profits, Mortgage Defendants assign the complex task of

---

[6] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Mar. 19, 2015).

[7] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Mar. 19, 2015).

administering the millions of loans serviced by them to computer software programs. The software programs are designed to manage borrowers' accounts and assess fees, according to protocols and policies designed by the executives at HSBC Mortgage and PHH Mortgage.

30.    Mortgage Defendants automate their loan servicing businesses through a computer software program provided by Fidelity National Information Services, Inc., which is called Mortgage Servicing Package ("Fidelity MSP"). Fidelity MSP, a sophisticated home loan management program, is one of the most widely used such programs in the United States.

31.    Loans serviced by Mortgage Defendants are automatically managed by the software according to uniform guidelines. For example, among other things, if a loan in the system is past due, the guidelines instruct the computer when to impose default-related fees. Mortgage Defendants also assess other charges and fees against borrowers' accounts by using "wrap around" software packages that work with the Fidelity MSP system. Based on parameters inputted into these programs, Mortgage Defendants' computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic. Mortgage Defendants assess fees for default-related services on borrowers' accounts through these systems.

### UNNECESSARY THIRD PARTY FEES FOR DEFAULT-RELATED SERVICES

32.    Rather than being motivated by a specific concern that a lender's interest in a property is at risk, Mortgage Defendants' system is programmed to order property inspections and BPOs at intervals demanded by private investors and the various government-sponsored enterprises ("GSEs") that own the mortgages serviced by Mortgage Defendants.

33.    It is the uniform mortgage note instrument executed by the borrowers (rather than just Mortgage Defendants' agreements with investors and GSEs) that supplies the purported

legal justification for Mortgage Defendants' authority to bill borrowers for these inspections and BPOs, and these notes *do not* permit the indiscriminate ordering and billing of property inspections and BPOs engaged in by Mortgage Defendants.  To the contrary, the mortgage notes provide that inspections and BPOs may be billed to borrowers only if they are necessary to protect the lender's interest in the property.

34.     Every home mortgage contains provisions specifying when payments are due and when they are considered late and providing that only reasonable fees may be assessed if payments are not timely.

35.     The mortgage contract between a lender and a borrower generally consists of two documents: the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  Plaintiff's notes are typical in this regard.  The mortgage contracts serviced by Mortgage Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract.  These contracts provide that Plaintiff's mortgage payment was due the first of each month and was considered late if it was not received by HSBC Mortgage by the end of fifteen calendar days after the date it was due.  In the event of a late payment, Plaintiff's note provided that a single late charge in the amount of 5% of the overdue payment (principal and interest) would be assessed.  Plaintiff's mortgage further permitted HSBC or its agents to undertake reasonable or appropriate actions to protect the Lender's interest in the Property.  The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

The Security Instrument further discloses that any such amounts disbursed by the servicer shall

become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note further discloses that the note holder "will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law."  Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower.  It does not, however, permit such fees to be assessed on borrowers' accounts when they are unreasonable or inappropriate.

36.     In fact, GSEs like Fannie Mae expressly warned Mortgage Defendants not to charge borrowers' accounts for multiple default-related services unless the circumstances of the particular property require it.  Fannie Mae's servicing guidelines explicitly provide that a BPO shall not be conducted more than every 120-days (unless the borrower is being evaluated for a loan modification program in which case the lender must order a BPO within the last 90-days).[8] Likewise, HUD guidelines explicitly provide that a lender may not charge a borrower for the cost of repeat occupancy inspections "if there is evidence that the [lender] knew the [borrower] was still in occupancy, such as documented communication with the [borrower], counseling agency, the [borrower's] attorney or the local HUD office…" as such charges are "inappropriate."[9]

37.     Defendants HSBC Bank and PHH, their subsidiaries, Defendants HSBC Mortgage and PHH Mortgage, their "property preservation" vendors, and the real estate brokers who provide BPOs for HSBC, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.

38.     By using the enterprise and Mortgage Defendants' computerized automated

---

[8] *See* https://www.fanniemae.com/content/guide/svc031412.pdf (last visited Mar. 20, 2015).

[9]  *See*  https://portal.hud.gov/hudportal/documents/huddoc?id=43301c9HSGH.pdf  (last  visited Mar. 20, 2015).

mortgage loan management system, Mortgage Defendants unlawfully charged and continue to charge unnecessary fees for default-related services.  Furthermore, to fraudulently conceal their actions and mislead borrowers about the true nature of its actions, Mortgage Defendants employ a corporate practice that omits the true nature of the fees that are being assessed on borrowers' accounts.

39.      Mortgage Defendants conceal these fees for unnecessary default-related services on borrowers accounts by identifying the charges only as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses" on borrowers' statements.  Under these categories, Mortgage Defendants assess fees for property inspections and BPOs on borrowers' accounts.[10]

40.      Mortgage Defendants' automated loan management system is set up to order property inspections and BPOs, and to assess related fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is necessary.  Although such inspections and BPOs purportedly are conducted to guard against property loss, Mortgage Defendants' practices are in fact designed to ensure that these fees are charged to as many accounts as possible, even if the inspections and BPOs are unnecessary.

41.      Moreover, so long as a borrower's account is past due on one payment by the requisite number of days programmed into the loan management software, and without regard to the condition of the property, Mortgage Defendants' system automatically continues to order inspections, regardless of whether they are necessary.

42.      Mortgage Defendants' computer system automatically generates work orders for property inspections and BPOs without human intervention.  No person or employee of PHH

---

[10] Indeed, the automated nature of the property inspections conducted and assessed by HSBC and PHH is further illustrated by the labeling of such fee as "**Auto** PPTY Inspection Assessed" contained within the itemized "Transaction Activity" on a borrower's monthly mortgage statement.  (emphasis added).

Mortgage or HSBC Mortgage is involved in the determination of whether a property inspection or BPO is reasonably necessary to protect the lender's interest in the property. Even if the property inspections were properly performed and actually reviewed by Defendants' personnel, Mortgage Defendants' continuous assessment of fees for these inspections on borrowers' accounts is still improper because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Mortgage Defendants' system to automatically continue to order monthly inspections.

43.     The Fidelity MSP system transmits property inspection and BPO work orders to one of the approved vendors with which Mortgage Defendants have an agreement. The vendors who conduct BPOs on Mortgage Defendants' behalf include Old Republic Default Management Services and FLSI. The vendors who conduct property inspections on Mortgage Defendants' behalf include Safeguard Real Estate Properties, LLC d/b/a of Safeguard Properties, LLC ("Safeguard").

44.      Once the approved vendor receives the computer generated work order, the inspection and/or BPO is performed and the cost is charged to the borrower's account.

45.     The vendor uploads a finished property inspection report directly into Mortgage Defendants' computer mainframe. Therefore, the computer system, rather than any person, checks the condition of the property and alerts Mortgage Defendants if a property is at risk.

46.     After the first property inspection is "triggered" by a default, Mortgage Defendants' computer system will continue to order property inspections every 20 to 45 days until the borrower cures the default. For example, if a borrower misses one month's periodic payment, but continues to consistently make monthly periodic payments thereafter, he or she is

considered by Mortgage Defendants to be in default on the loan until the initial default is cured. Therefore, although a borrower continues to make regular periodic payments after having only missed one month's payment, Mortgage Defendants' computer system will continue to automatically generate work orders for property inspections until the initial default is cured.

47.     Further, because the property inspections are ordered based on a computer program rather than human decision-making, property inspections may be performed on a borrower's property regardless of whether the property has already been inspected numerous times and was previously deemed occupied, well-maintained and in good condition.

48.     Likewise, Mortgage Defendants allegedly conduct BPOs to assess the value of the property in anticipation of a foreclosure sale.   However, Mortgage Defendants continue to conduct BPOs and assess the fees to borrowers over the course of several years from the time the property initially goes into foreclosure up until the time that the property ultimately sells during a foreclosure sale.   In New York State it takes approximately one to three years for a foreclosure sale date to be assigned to a property after foreclosure proceedings have been commenced. Thus, during those years between foreclosure and the ultimate sale of the property, Mortgage Defendants conduct BPOs every several months.  This practice is not reasonable or appropriate because such appraisals become outdated and cannot provide an accurate assessment of the property value at the time the property actually sells during a foreclosure sale.

49.     Mortgage Defendants' practices with respect to property inspections are in stark contrast to the Federal Housing Administration's guidelines for property inspections on homes that are federally insured.  FHA guidelines provide that a mortgage servicer should perform and can be reimbursed for one (1) initial property inspection that should be conducted if a mortgagor's payment is not received within 45 days of the due date and efforts to reach the

14

borrower by telephone are unsuccessful.  If the initial property inspection reveals that the property is occupied or if occupancy is confirmed through another method (i.e., the borrower makes a payment or contact is made by telephone), FHA guidelines state that the mortgage servicer will not be reimbursed for any additional inspections and additional inspections are not required.  Mortgage Defendants, in contrast, allow property inspections to be conducted every 20 to 45 days until a borrower cures a default regardless of whether the previous inspection revealed that the house was occupied and well maintained, regardless of whether Mortgage Defendants have made contact with the borrower through telephone or other means, and regardless of whether the borrower continues to make payments.

50.     Mortgage Defendants regularly conducted their mortgage servicing operations by designing, operating and managing the Fidelity MSP computer software to intentionally charge borrowers unreasonable, improper and unlawful fees.

51.     The Fidelity MSP system is not tied to the Plaintiff's or Class members' mortgage agreements, but was designed and operated in a centralized fashion to defraud hundreds of thousands or millions of borrowers that had their mortgages serviced by Mortgage Defendants.

52.     As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default - and to continuously order those inspections thereafter until the default is cured - is neither reasonable nor appropriate as this practice is not designed to protect the lender's interest in the property.  Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

53.     That these computer-generated inspections are unreasonable, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for Mortgage Defendants is further evidenced by the limited nature of the inspections themselves.   The property inspections ordered by Mortgage Defendants' computer system are mere "drive-by" inspections, i.e., the inspector "drives by" the property ostensibly to assess whether the house is occupied, being maintained, and has not been damaged – a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk.

54.     As part of its scheme to generate fees, Mortgage Defendants repeatedly sent to Plaintiff and Class members materially false and misleading agreements, contracts and monthly mortgage statements by mail and wire.   Mortgage Defendants' scheme was also designed to conceal its existence and dissuade borrowers from challenging the unlawful fee assessments. Specifically, Mortgage Defendants conceal the nature of the improper and unlawful inspection fees from borrowers by listing them on the borrower's statement only as "Other Fees" and "Assessed Expenses."

**BORROWERS SUFFER HARM AS
A RESULT OF MORTGAGE DEFENDANTS' PRACTICES**

55.     In addition to the direct monetary damages caused to borrowers, in the form of additional, unlawful debts assessed on borrowers' accounts, borrowers suffer other injuries as a result of the practices described herein.

56.     The assessment of these fees can make it impossible for borrowers to become current on their loan.   Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

57.     When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Mortgage Defendants'

16

practices make it increasingly difficult for borrowers to ever bring their loan current.  Even if borrowers pay the delinquent principal and interest payments, the fees for unnecessary default-related services ensure that borrowers stay in default.  After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears that keeps borrowers in delinquency.  The weight of these unnecessary fees drops borrowers into a financial abyss.

58.     As a result of Mortgage Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Mortgage Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments.  By keeping borrowers in default with these practices, Mortgage Defendants affect whether borrowers can get a loan in the future – and what borrowers' interest rate will be on such loans.

## MORTGAGE DEFENDANTS CHARGED PLAINTIFF UNNECESSARY AND UNAUTHORIZED FEES FOR DEFAULT-RELATED SERVICES

59.     On or about December 22, 2008, Plaintiff Tardibuono-Quigley purchased a new home in New Rochelle, New York, and entered into a mortgage agreement with HSBC Mortgage to borrow money for the purchase of the home.

60.     Mrs. Tardibuono-Quigley's mortgage agreement with HSBC Mortgage only permits HSBC or its agents to do and pay whatever is reasonable or appropriate to protect the Lender's interest in the Property.

61.     Each month Mrs. Tardibuono-Quigley received a monthly mortgage statement for the loan through the U.S. mail reflecting the amount of the current payment due and the amount

of any payment remitted by Mrs. Tardibuono-Quigley and received by HSBC Mortgage since the prior month's statement.

62.     Over the life of the loan, Mrs. Tardibuono-Quigley occasionally faced difficulty making timely payments on her loan, and she was ultimately unable to make payments after December 1, 2012.

63.     Prior to defaulting, Mrs. Tardibuono-Quigley was assessed unlawful inspection fees. For example, monthly mortgage statements and PHH Mortgage's internal records reveal that Mrs. Tardibuono-Quigley made a payment on or about January 31, 2011. A portion of the January 31, 2011 payment was first applied to prior late charges and thus caused her to remain delinquent on the current payment owed. These records further reveal that Mrs. Tardibuono-Quigley's next mortgage payment was due on February 1, 2011 and she was charged for an "AUTO PPY INSPEC" on February 24, 2011. Notably, this property inspection was conducted less than 30 days from her last payment to HSBC (and thus HSBC had contact with Mrs. Tardibuono-Quigley confirming her occupancy of the subject premise) and only 24 days after the last payment was due. Likewise, these records reveal that Mrs. Tardibuono-Quigley made a payment on November 26, 2012, but was charged for an "AUTO PPY INSPEC" on that same day. Significantly, Mrs. Tardibuono-Quigley's last payment was received by Defendants exactly 30-days prior on October 26, 2012.

64.     Between February 2011 through December 1, 2012, Mrs. Tardibuono-Quigley made intermittent payments and was assessed numerous unlawful inspection fees. Specifically:

        a.      Payment on January 31, 2011;

        b.      "AUTO PPY INSPEC" on February 24, 2011 in the amount of $12.50;

        c.      "AUTO PPY INSPEC" on March 21, 2011 in the amount of $12.50;

18

d.      "AUTO PPY INSPEC" on April 21, 2011 in the amount of $12.50;

e.      Payment on May 11, 2011;

f.      "AUTO PPY INSPEC" on July 25, 2011 in the amount of $12.50;

g.      "AUTO PPY INSPEC" on August 22, 2011 in the amount of $12.50;

h.      Payment of August 23, 2011;

i.      "AUTO PPY INSPEC" on September 22, 2011 in the amount of $12.50;

j.      "AUTO PPY INSPEC" on October 26, 2011 in the amount of $12.50;

k.      "AUTO PPY INSPEC" on November 28, 2011 in the amount of $12.50;

l.      "AUTO PPY INSPEC" on December 27, 2011 in the amount of $12.50;

m.      "AUTO PPY INSPEC" on February 21, 2012 in the amount of $12.50;

n.      Payment of March 30, 2012;

o.      Payment on April 27, 2012;

p.      Payment on May 29, 2012;

q.      Payment on June 29, 2012;

r.      Payment on July 27, 2012;

s.      "AUTO PPY INSPEC" on August 20, 2012 in the amount of $12.50;

t.      "AUTO PPY INSPEC" on September 24, 2012 in the amount of $12.50;

u.      "AUTO PPY INSPEC" on October 22, 2012 in the amount of $12.50;

v.      Payment on October 26, 2012;

w.      "AUTO PPY INSPEC" on November 26, 2012 in the amount of $12.50;

x.      Payment on November 26, 2012.

65.     Significantly, many of these property inspections were conducted 30-days or less after HSBC received a payment from Mrs. Tardibuono-Quigley, thus evidencing her occupancy

of the subject premise so as to nullify any justification of performing an initial property inspection or an occupancy inspection (once every 30-days so long as the lender does not have contact from the borrower).

66.     Mrs. Tardibuono-Quigley was unable to make any further mortgage payments following her payment on November 26, 2012.

67.     From November 26, 2012 until the present, Mrs. Tardibuono-Quigley has been assessed 30 property inspection fees.  Specifically:

      a.      "AUTO PPY INSPEC" on December 24, 2012 in the amount of $12.50;

      b.      "AUTO PPY INSPEC" on January 31, 2013 in the amount of $12.50;

      c.      "AUTO PPY INSPEC" on February 27, 2013 in the amount of $12.50;

      d.      "AUTO PPY INSPEC" on March 22, 2013 in the amount of $12.50;

      e.      "AUTO PPY INSPEC" on April 26, 2013 in the amount of $12.50;

      f.      "AUTO PPY INSPEC" on May 31, 2013 in the amount of $11.25;

      g.      "AUTO PPY INSPEC" on June 26, 2013 in the amount of $11.25;

      h.      "AUTO PPY INSPEC" on July 26, 2013 in the amount of $11.25;

      i.      "AUTO PPY INSPEC" on August 23, 2013 in the amount of $11.25;

      j.      "AUTO PPY INSPEC" on September 25, 2013 in the amount of $11.25;

      k.      "AUTO PPY INSPEC" on October 24, 2013 in the amount of $11.25;

      l.      "AUTO PPY INSPEC" on November 22, 2013 in the amount of $11.25;

      m.      "AUTO PPY INSPEC" on December 23, 2013 in the amount of $11.25;

      n.      "AUTO PPY INSPEC" on January 27, 2014 in the amount of $11.25;

      o.      "AUTO PPY INSPEC" on February 26, 2014 in the amount of $11.25;

      p.      "AUTO PPY INSPEC" on March 28, 2014 in the amount of $11.25;

q. "AUTO PPY INSPEC" on April 25, 2014 in the amount of $11.25;

r. "AUTO PPY INSPEC" on May 28, 2014 in the amount of $11.25;

s. "AUTO PPY INSPEC" on June 20, 2014 in the amount of $11.25;

t. "AUTO PPY INSPEC" on July 25, 2014 in the amount of $11.25;

u. "AUTO PPY INSPEC" on August 22, 2014 in the amount of $11.25;

v. "AUTO PPY INSPEC" on September 24, 2014 in the amount of $11.25;

w. "AUTO PPY INSPEC" on October 23, 2014 in the amount of $11.25;

x. "AUTO PPY INSPEC" on November 24, 2014 in the amount of $11.25;

y. "AUTO PPY INSPEC" on December 31, 2014 in the amount of $11.25;

z. "AUTO PPY INSPEC" on January 30, 2015 in the amount of $11.25.

aa. "AUTO PPY INSPEC" on March 12, 2015 in the amount of $11.25.

bb. "AUTO PPY INSPEC" on March 27, 2015 in the amount of $11.25.

cc. "AUTO PPY INSPEC" on May 18, 2015 in the amount of $11.25.

dd. "AUTO PPY INSPEC" on May 22, 2015 in the amount of $11.25.

68. Likewise, upon defaulting on her loan, Mortgage Defendants conducted 9 BPOs of Mrs. Tardibuono-Quigley's home. Specifically, BPOs were conducted on:

a. December 20, 2012, "BPOO Brokers Opinion" in the amount of $100.00;

b. February 20, 2013, "BPOO FLIP" in the amount of $100.00;

c. March 29, 2013, "BPOO Brokers Opinion" in the amount of $100.00;

d. August 13, 2013, "BPO Cost" in the amount of $95.00 conducted by third-party vendor "FLSI";

e. November 11, 2013, "BPO Cost" in the amount of $85.00 conducted by third-party vendor "Old Republic";

    f.     March 6, 2014, "BPO Cost" in the amount of $110.00 conducted by third-party vendor "FLSI";

    g.     July 25, 2014, "BPO Cost" in the amount of $85.00 conducted by third-party vendor "Old Republic";

    h.     October 31, 2014, "BPO Cost" in the amount of $85.00 conducted by third-party vendor "Old Republic";

    i.     February 13, 2015, "BPO Cost" in the amount of $110.00 conducted by third-party vendor "FLSI."

69.    Fannie Mae's servicing guidelines provide that BPOs may be conducted to preserve a lender's interest in the property when a borrower has defaulted and the lender must assess the value of the property in anticipation of a foreclosure sale.  Thus, the BPO appraisal value of the property is only relevant to a foreclosure sale.

70.    Significantly, although Mrs. Tardibuono-Quigley has been considered to be in foreclosure since February 28, 2013, at no point was a foreclosure sale date ever assigned to her home.  Moreover, from February 2014 until February 2015, Mrs. Tardibuono-Quigley had been in constant contact with Mortgage Defendants attempting to enter into a loan modification agreement to keep her home and become current on her mortgage obligation.  Despite no foreclosure sale date ever being assigned and Mrs. Tardibuono-Quigley's constant contact with Mortgage Defendants, Mortgage Defendants conducted 4 BPOs between February 2014 and February 2015.

71.    Mrs. Tardibuono-Quigley made contact with PHH Mortgage on or about February 28, 2014.  At this time PHH Mortgage and Mrs. Tardibuono-Quigley discussed the option of loan modification to prevent a foreclosure sale on her home.  Subsequently, Mrs. Tardibuono-

Quigley remained in constant contact with PHH Mortgage from February 28, 2014 through March 2015.

72.     During this time PHH Mortgage was fully aware that Mrs. Tardibuono-Quigley and her family occupied her home.  Despite Mrs. Tardibuono-Quigley constant contact with PHH Mortgage and the fact that PHH Mortgage knew that Mrs. Tardibuono-Quigley was occupying her home, Mortgage Defendants conducted 15 property inspections of Mrs. Tardibuono-Quigley's home.

73.     Furthermore, PHH Mortgage advised Mrs. Tardibuono-Quigley that she would continue to receive charges for automated property inspections through finalization of her loan modification plan.  Thus despite the fact that Mortgage Defendants were fully aware Mrs. Tardibuono-Quigley occupies her home and after she was approved for a trial loan modification, Mortgage Defendants continue to conduct exterior drive-by property inspections of her home. Accordingly, there can be no valid justification for the continue drive-by inspections as Mortgage Defendants had made contact with the borrower and were fully aware that the home remains occupied.

74.     Moreover, Mrs. Tardibuono-Quigley resides in a co-op building on the third floor. Her building does not permit public access and any person who enters the building must have a key or be buzzed in through an intercom system.  A drive-by inspection of Mrs. Tardibuono-Quigley's residence would not ascertain anything regarding the occupancy of Mrs. Tardibuono-Quigley's home.  Even if inspectors somehow gained entry to the building, they could discern nothing of value or significance from the hallway.

75.     Because Mrs. Tardibuono-Quigley continued to make monthly payments, even when she fell behind, and continuously occupied her home, these inspections were not necessary

to protect the lender's interest in the property and were merely conducted to generate additional fees and more float income for Mortgage Defendants. Indeed, the fact that Mortgage Defendants continued to charge Mrs. Tardibuono-Quigley for inspections and BPO after making contact with her to discuss a loan modification application and continue to charge property inspection fees *even after she was approved for a temporary loan modification* further demonstrates that these inspections served no legitimate purpose.

76.     Mortgage Defendants concealed the assessed fees for default-related services, including property inspections and BPOs, on the mortgage account of Plaintiff Tardibuono-Quigley. On mortgage statements provided to Mrs. Tardibuono-Quigley from 2011 to present, these assessments were identified as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses."

77.     Moreover, Mortgage Defendants failed to disclose that lenders and/or investors for whom they service loans issued guidelines to Mortgage Defendants warning them not to charge borrowers with unnecessary, repetitive fees.

78.     Plaintiff paid unlawful fees for property inspections and BPOs.

## **CLASS ACTION ALLEGATIONS**

79.     Plaintiff brings this action, on behalf of herself and all others similarly situated, as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

80.     The classes Plaintiff seeks to represent (collectively, the "Class") are defined as follows:

> All residents of the United States of America who had a loan serviced by HSBC Mortgage Corporation (USA), HSBC Bank USA, N.A., PHH Corporation, or PHH Mortgage Corporation at anytime after September 2, 2009 to the present, and whose accounts were assessed fees for Broker's Price Opinions and inspection fees (the "Nationwide Class").

All residents of the State of New York who had a loan serviced by HSBC Mortgage Corporation (USA), HSBC Bank USA, N.A., PHH Corporation, or PHH Mortgage Corporation at anytime after September 2, 2009 to the present, and whose accounts were assessed fees for Broker's Price Opinions and inspection fees (the "New York Class").

81.    Excluded from the Class are Defendants, any entity in which a Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a Defendant, and any Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns.

82.    The proposed Class encompasses hundreds of thousand or millions of individuals who are geographically dispersed throughout the United States.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

83.    All members of the Class have been subject to and affected by the same practices and policies described herein.  There are questions of law and fact that are common to the Class and which predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a.    Whether Mortgage Defendants had a policy and practice of fraudulently charging persons in arrears unlawful and unreasonable inspection fees and/or BPOs;

    b.    Whether Mortgage Defendants have engaged in mail and wire fraud;

    c.    Whether Defendants were members of, or participants in, the conspiracy alleged herein;

    d.    Whether Defendants engaged in a pattern of racketeering activity;

    e.    Whether documents and statements provided to Plaintiff and members of the Class omitted material facts;

      f.      Whether the Defendants are an enterprise within the meaning of 18 U.S.C. § 1961(4);

      g.     Whether Defendants conducted or participated in the affairs of the HSBC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

      h.     Whether Defendants were unjustly enriched by its deceptive practices;

      i.      Whether Defendants' unlawful, unfair and deceptive practices harmed Plaintiff and the Class;

      j.      Whether the Court can enter declaratory and injunctive relief; and

      k.     The proper measure of damages.

84.    The claims of the named Plaintiff are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that the Plaintiff and the other members of the Class were subject to the same wrongful policies and practices by Defendants.

85.    The individually named Plaintiff will fairly and adequately represent the interests of the proposed Class.  She is committed to the vigorous prosecution of the Class' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

86.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

87.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the

Class.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Plaintiff Class.

88.     The Defendants have acted or refused to act on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.

89.     The questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

90.     Notice to the proposed Class can be achieved through the U.S. mail to the addresses of the Class members that are kept within Defendants' records.  Notice can also be supplemented via publication.

91.     A Class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

    a.     Individual claims by the Class members are impractical as the costs of pursuit far exceed what any one individual Plaintiff has at stake;

    b.     As a result, individual members of the Class have no interest in prosecuting and controlling separate actions;

    c.     It is desirable to concentrate litigation of the claims herein in this forum;

    d.     The proposed Class action is manageable.

92.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION
**Violations of the Racketeer Influenced and Corrupt Organizations Act**
**(18 U.S.C. §1962(c))**

93.     Plaintiff incorporates by reference in this cause of action each and every

allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

94.     Plaintiff brings this cause of action on behalf of herself and the members of the Nationwide Subclass.

## THE ENTERPRISE

95.     Defendants HSBC Mortgage, HSBC Bank, PHH and PHH Mortgage are each persons within the meaning of Title 18 United States Code section 1961(3).

96.     At all relevant times, in violation of Title 18 United States Code section 1962(c), Defendants, including their directors, employees, and agents, along with their "property preservation" vendors, including but not limited to Safeguard Real Estate Properties, LLC d/b/a of Safeguard Properties, LLC ("Safeguard"), and the real estate brokers, including but not limited to Old Republic Default Management Services ("Old Republic"), who provide BPOs for Defendants, conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "HSBC Enterprise").  The affairs of the HSBC Enterprise affected interstate commerce through a pattern of racketeering activity.

97.     The HSBC Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of routinely and repeatedly, ordering, conducting, and assessing borrowers' accounts for unnecessary default-related services.

98.     While the members of the HSBC Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The HSBC Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendants, the real estate brokers who perform BPOs, including Old Republic, and the vendors that perform property inspections,

including Safeguard.

99.    Operating the HSBC Enterprise according to policies and procedures developed and established by their executives, HSBC Mortgage, HSBC Bank, PHH, and PHH Mortgage control and direct the affairs of the HSBC Enterprise and use the other members of the HSBC Enterprise as instrumentalities to carry out the HSBC Enterprise's fraudulent scheme.

100.    These policies and procedures established by Defendants' executives include: programing Mortgage Defendants' automated loan management system to order default related services, including property inspections and BPOs, and assessing fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether conducting such default-related services is reasonable or necessary under the circumstances; directing Safeguard to conduct property inspections without consideration for whether they are necessary; directing Old Republic to conduct BPOs without consideration for whether they are necessary; providing statements that fail to disclose the true nature of the unnecessary fees; cryptically identifying default-related service fees as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses"; and failing to provide borrowers with documentation to support assessments of fees for BPOs.

101.    By developing and implementing policies and procedures leading to the repeated, and unlawful, ordering and assessment of fees for unnecessary default-related services, HSBC Mortgage, HSBC Bank, PHH and PHH Mortgage engaged in the conduct of the HSBC Enterprise distinct from Mortgage Defendants' own affairs as a loan servicer and inconsistent with the servicing guidelines under which it is obligated to operate.

## THE PREDICATE ACTS

102.    Defendants' systematic schemes to fraudulently conceal assessments of

unnecessary third party fees on the accounts of borrowers who have mortgage loans administered by Mortgage Defendants was facilitated by the use of the United States Mail and wire. Mortgage Defendants' schemes constitute "racketeering activity" within the meaning of Title 18 United States Code section 1961(1) as acts of mail and wire fraud under Title 18 United States Code sections 1341 and 1343.

103.   In violation of Title 18 United States Code sections 1341 and 1343, Mortgage Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Mortgage Defendants by obtaining money from borrowers using false or fraudulent pretenses.

104.   Through the mail and wire, the HSBC Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, requiring that borrowers pay fraudulently concealed unnecessary fees for default-related services, such as BPOs or property inspections. Mortgage Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

105.   The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts. Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses," to obtain full payments from borrowers, Mortgage Defendants disguised the true nature of these fees and omitted the fact that the fees were unnecessary and inconsistent with the servicing guidelines issued by lenders and/or investors to Mortgage Defendants warning them not to charge borrowers with unnecessary, repetitive fees. By omitting and fraudulently concealing the true nature of amounts purportedly owed in communications to borrowers, Mortgage Defendants

made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

106.    Furthermore, to lull borrowers into a sense of trust, conceal Mortgage Defendants' unlawful fees, and dissuade borrowers from challenging Mortgage Defendants' unlawful fee assessments, Mortgage Defendants further concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument."

107.    Mortgage Defendants' omissions were material to Plaintiff and the members of the Class.  Had Mortgage Defendants disclosed the true unnecessary and unauthorized nature of the fees for default-related services, Plaintiff would have been aware and would have challenged Mortgage Defendants' unlawful fee assessments or they would not have paid them.

108.    Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

109.    Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Mortgage Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

110.    In an effort to pursue their fraudulent scheme, Mortgage Defendants knowingly fraudulently concealed or omitted material information from Plaintiff and members of the Class. Mortgage Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the unnecessary nature of the fees in their communications to borrowers.

111.    The predicate acts specified above constitute a "pattern of racketeering activity"

within the meaning of Title 18 United States Code section 1961(5) in which Mortgage Defendants have engaged under Title 18 United States Code section 1962(c).

112.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the HSBC Enterprise racketeering enterprise.   The racketeering acts committed by the HSBC Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.

113.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

114.    Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

115.    As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiff and members of the class have suffered substantial damages. Defendants are liable to Plaintiff and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## SECOND CAUSE OF ACTION
### Conspiracy To Violate Title 18 United States Code Section 1962(c)
### (18 U.S.C. §1962(d))

116.    Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

117.    Plaintiff brings this cause of action on behalf of herself and the members of the Nationwide Class.

118. As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants HSBC Mortgage, HSBC Bank, PHH and PHH Mortgage conspired to violate the provisions of Title 18 United States Code section 1962(c).

119. As set forth above, HSBC Mortgage, HSBC Bank, PHH and PHH Mortgage, having directed and controlled the affairs of the HSBC Enterprise, were aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

120. As a direct and proximate result, Plaintiff and the members of the Nationwide Subclasses have been injured in their business or property by the predicate acts which make up Defendants' patterns of racketeering activity in that unnecessary fees for default-related services were assessed on their mortgage accounts.

**THIRD CAUSE OF ACTION**
**Violation of NY General Bus. Law §§ 349 et seq.**

121. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

122. Plaintiff brings this cause of action on behalf of herself and the members of the New York Subclass.

123. This action is brought to secure redress for the deceptive practices perpetrated by Mortgage Defendants against Plaintiff and the Class members.

124. Plaintiff and Class Members are consumers and they are the end users and intended beneficiaries of Mortgage Defendants' services.

125. As a provider of residential loan services to the consuming public and whose conduct affects similarly situated consumers and has a broad impact on consumers at large, Mortgage Defendants are engaged in consumer-oriented conduct within the intended ambit of GBL § 349.

126.     Mortgage Defendants' actions and/or omissions as described herein violated GBL § 349 et seq., which were enacted to protect the consuming public from those who engage in deceptive acts or practices in the conduct of any business, trade or commerce.

127.     Specifically, Mortgage Defendants   knowingly misrepresented and intentionally omitted material information regarding the fees assessed to borrowers' accounts for unnecessary default-related services.   These unnecessary default-related services included property inspections and BPOs, and Mortgage Defendants identified the charges only as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses" on borrowers' statements.

128.     Mortgage Defendants violated GBL § 349 by knowingly and falsely representing that Mortgage Defendants' loan servicing conformed to the terms and conditions of Plaintiff and class members' Note and Security Instrument, including that it would charge only reasonable and appropriate  fees, when Mortgage Defendants knew the repetitive fees assessed for property inspections and BPOs were unlawful, against the terms of Plaintiff and class members' Note and Security Instrument, and inherently misleading as they were disguised as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses" on borrowers' statements.

129.     Mortgage Defendants' deceptive and misleading actions and omissions as set forth herein have caused and continue to cause injury to Plaintiff and the Class Members.

130.     As a direct and proximate result of Mortgage Defendants' violations of GBL § 349, Plaintiff and the Class members have suffered and continue to suffer damages. Plaintiff and the Class Members are  entitled  to  compensatory damages, equitable and declaratory  relief,  punitive damages, costs and reasonable attorneys' fees.

34

## FOURTH CAUSE OF ACTION
### Breach of Contract

131.    Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

132.    Plaintiff and Defendants entered into a mortgage contract pursuant to which Defendants agreed to charge only reasonable and appropriate fees for default-relates services, including property inspections and BPOs.

133.    Defendants breached that agreement by charging unreasonable and inappropriate fees for inspections and BPOs.

134.    Plaintiff was injured as a result because Defendants charged, and Plaintiff paid, unauthorized fees to her account; Defendants failed to fully credit subsequent payments owing to deductions from these fees; and Defendants caused Plaintiff to incur additional late fees because they failed to credit the full amount of monthly payments owing to such unauthorized fees.

135.    Defendants also breached their duty of good faith and fair dealing by failing to reasonably exercise their discretion with respect to default related fees by instead ordering unreasonable and unnecessary property inspections and BPOs.

136.    Plaintiff and members of the Class seek damages from Defendants resulting from its beach of the mortgage agreement.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

137.    Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

138.    Plaintiff bring this cause of action on behalf of herself and the members of the Nationwide Subclass.

139.    By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiff and members of the Class.

140.    Plaintiff and the members of the Class's mortgage contract disclose that Defendants will pay for default-related services when necessary, and they will be reimbursed by the borrower.  Nowhere in the mortgage contract is it disclosed that Defendants may incur unnecessary third party fees.

141.    Additionally, GSEs like Fannie Mae expressly warned Defendants not to charge borrowers' accounts for multiple default-related services unless the circumstances of the particular property require it.

142.    Nevertheless, Mortgage Defendants assess such fees on borrowers' accounts without adequate concern for whether they are necessary.

143.    Thus, Plaintiff and members of the Class were unjustly deprived.

144.    Mortgage Defendants are aware that it is improper to assess unnecessary third party fees on borrowers' accounts for default-related services.  Therefore, Mortgage Defendants fraudulently conceal these fees on borrowers' accounts by identifying them on mortgage statements only as "Total New Fees and Charges," "Other Fees," and "Assessed Expenses."

145.    Furthermore, to lull borrowers into a sense of trust, conceal Mortgage Defendants' unlawful fees, and dissuade borrowers from challenging Mortgage Defendants' unlawful fee assessments, Mortgage Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument."

146.    It would be inequitable and unconscionable for Mortgage Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and

misleading conduct alleged herein.

147.    Plaintiff and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

Plaintiff, and on behalf of herself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.    Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.    Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged omissions discussed herein;

3.    Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.    Awarding restitution and disgorgement of Defendants' revenues or profits to Plaintiff and members of the Class;

5.    Awarding Plaintiff and the members of the Class treble damages in an amount according to proof at trial;

6.    Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

7.    Awarding interest on the monies wrongfully obtained from the date of collection

through the date of entry of judgment in this action;

       8.     Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

       9.     For such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

DATED:  September 2, 2015
         White Plains, New York

                   By:    */s/ D. Greg Blankinship*
                           D. Greg Blankinship
                           Todd S. Garber
                           Jeremiah Frei-Pearson
                           **FINKELSTEIN, BLANKINSHIP,**
                           **FREI-PEARSON & GARBER, LLP.**
                           1311 Mamaroneck Avenue
                           White Plains, New York 10605
                           Telephone:  (914) 298-3281
                           Fax:  (914) 824-1561
                           tgarber@fbfglaw.com
                           jfrei-pearson@fbfglaw.com
                           gblankinship@fbfglaw.com

                           *Counsel for Plaintiff and the Class*