UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAWN TARDIBUONO-QUIGLEY, on behalf of
herself and all others similarly situated,

                                Plaintiff,

     -v-

HSBC MORTGAGE CORPORATION (USA),
HSBC BANK USA, N.A., and PHH MORTGAGE
CORPORATION,

                              Defendants.

No. 15-CV-6940 (KMK)

AMENDED OPINION & ORDER

Appearances:

Todd S. Garber, Esq.
Douglas G. Blankinship, Esq.
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
*Counsel for Plaintiff*

James L. Bernard, Esq.
Julia B. Strickland, Esq.
David W. Moon, Esq.
Nathan H. Stopper, Esq.
Raymond A. Garcia, Esq.
Wesley Griffith, Esq.
Stroock & Stroock & Lavan LLP
New York, NY
Los Angeles, CA
*Counsel for HSBC Defendants*

Joseph L. Mooney, Esq.
Goldberg Segalla, LLP
Buffalo, NY
*Counsel for HSBC Mortgage Corporation (USA)*

Alyssa A. Sussman, Esq.
Joseph F. Yenouskas, Esq.
Thomas M. Hefferon, Jr., Esq.
Goodwin Procter, LLP
New York, NY
Washington, DC
*Counsel for PHH Mortgage Corporation*

KENNETH M. KARAS, District Judge:

Plaintiff Dawn Tardibuono-Quigley ("Plaintiff") brings this putative Class Action against HSBC Mortgage Corporation (USA) ("HSBC Mortgage"), HSBC Bank USA, N.A. ("HSBC Bank," and collectively, "HSBC Defendants"), and PHH Mortgage Corporation ("PHH," and collectively with the HSBC Defendants, "Defendants"), alleging that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspired to violate RICO, 18 U.S.C. § 1962(d), violated New York General Business Law ("GBL") § 349, breached a contract, and were unjustly enriched by a scheme to charge borrowers for unnecessary default-related services.  (*See generally* Am. Compl. (Dkt. No. 44).)  Defendants have filed Motions To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions").  (Dkt. Nos. 46, 49.)  For the reasons stated below, PHH's Motion is granted in full, and the HSBC Defendants' Motion is granted in part and denied in part.[1]

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and the documents appended thereto, and are taken as true for the purpose of resolving the Motions.

#### 1.  Defendants and Their Mortgage Servicing Practices

HSBC Bank is the parent company of HSBC Mortgage, which is a mortgage lender, originator, and servicer.  (Am. Compl. ¶ 14.)  "HSBC Bank exercised, and exercises, specific and

---

[1] The conclusion section of this Opinion was amended to reflect that the only claims surviving Defendants' Motions are the GBL and breach of contract claims asserted against HSBC Mortgage.

financial control over the operations of HSBC Mortgage, and it dictates, and dictated, the policies and practices of HSBC Mortgage." (*Id.* ¶ 19.)

PHH is a mortgage servicer. (*Id.* ¶ 16.) HSBC Bank and PHH entered into a "strategic relationship" in 2012 whereby PHH agreed to manage HSBC Bank's mortgage processing and servicing operations. (*Id.* ¶ 17.) According to the terms of the agreement entered into at that time, PHH was contracted to provide HSBC Bank "with mortgage origination processing services as well as sub-servicing of the bank's prime mortgage loan portfolio and for other portfolios." (*Id.*)

HSBC Mortgage and PHH utilize computer programs to help manage the mortgages they service. (*Id.* ¶ 26.) The programs are devised to assess fees to borrowers' accounts based on protocols and policies designed by executives at HSBC Mortgage and PHH. (*Id.*) After a borrower misses a loan payment—i.e., defaults—the programs automatically send work orders to third-party vendors that perform property inspections and broker price opinions ("BPOs") on the mortgaged properties. (*Id.* ¶¶ 37, 39.) The property inspections are "drive-by" inspections whereby an inspector "'drives by' the property ostensibly to assess whether the property is occupied, being maintained, and has not been damaged." (*Id.* ¶ 49 (some internal quotation marks omitted).) A BPO consists of a real estate broker assessing the value of the mortgaged property, normally in anticipation of a foreclosure sale. (*Id.* ¶¶ 45, 62.) The costs associated with these services are passed on to the homeowners in the form of fees added to the monthly mortgage statements mailed or otherwise delivered to the homeowners. (*Id.* ¶ 41.) Defendants derive their authority to bill the homeowners for these services from the security agreements borrowers must sign before receiving a loan.

Until the default is cured, the computer programs continue to order property inspections every 20 to 45 days.  (*Id.* ¶ 43.)  Plaintiff alleges that the mortgage servicing programs are designed such that the property inspection and BPO fees are charged to as many accounts as possible, "even if the inspections and BPOs are unnecessary."  (*Id.* ¶ 37; *see also id.* ¶ 47 ("This system is . . . designed and operated in a centralized fashion to defraud hundreds of thousands or millions of borrowers that had their loans serviced by" HSBC Mortgage and PHH.).)  Ultimately, HSBC Bank is the recipient of the allegedly "ill-gotten" gains because borrowers are directed to send their mortgage payments to HSBC Bank.  (*Id.* ¶ 19; Decl. of Alyssa A. Sussman, Esq., in Supp. of PHH's Mot. To Dismiss Ex. 4 ("Mortgage Statements") (Dkt. No. 51).)[2]

### 2.  Default-Related Services Provided to Plaintiff

In December 2008, Plaintiff borrowed $280,800 from HSBC Mortgage to purchase a third-floor cooperative apartment (the "co-op") in New Rochelle, New York.  (Am. Compl. ¶¶ 55, 67.)  Plaintiff signed a promissory note (the "Mortgage Note") agreeing to pay back HSBC Mortgage the amount of the loan, (*see id.* Ex. 1 ("Mortgage Note")), and signed a security agreement (the "Security Agreement") with HSBC Mortgage pledging the co-op as security for the loan, (*id.* ¶ 55; *see also id.* Ex. 2 ("Security Agreement")).  The Security Agreement specifies that the "Consequences of Default" include demanding immediate payment of all past-due amounts, the right to sell the co-op and demand that Plaintiff immediately vacate the premises, Plaintiff's forfeiture of voting rights, the appointment of a receiver, and any other rights HSBC Mortgage may have as a matter of law.  (Security Agreement 4–5.)  Under the heading "Payment

---

[2] The Court can consider these billing statements because they are integral to and referenced in the Amended Complaint.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (internal quotation marks omitted)).

of Expenses," the Security Agreement provides: "You [HSBC Mortgage] have the right to make payments for me [Plaintiff] or to *take any action needed* to comply with the terms of my Proprietary Lease or *to protect or defend your Security*."  (*Id.* at 6 (emphases added).)  In another section, HSBC Mortgage reserved the right to "inspect [the co-op] at any reasonable time."  (*Id.* at 3.)

Over the course of the loan, Plaintiff "occasionally faced difficulty making timely payments on her loan, and as a consequence she missed several payments."  (Am. Compl. ¶ 56.) Plaintiff alleges that after she defaulted, Defendants ordered and charged her for numerous unnecessary property inspections.  (*Id.*)  From the end of January 2011 through December 1, 2012, Plaintiff made payments and was improperly charged inspection fees as follows:

- Payment on January 31, 2011;
- Property inspection on February 24, 2011;
- Property inspection on March 21, 2011;
- Property inspection on April 21, 2011;
- Payment on May 11, 2011;
- Property inspection on July 25, 2011;
- Property inspection on August 22, 2011;
- Payment on August 23, 2011;
- Property inspection on September 22, 2011;
- Property inspection on October 26, 2011;
- Property inspection on November 28, 2011;
- Property inspection on December 27, 2011;
- Property inspection on February 21, 2012;
- Payment on March 30, 2012;
- Payment on April 27, 2012;
- Payment on May 29, 2012;
- Payment on June 29, 2012;
- Payment on July 27, 2012;
- Property inspection on August 20, 2012;
- Property inspection on September 24, 2012;
- Property inspection on October 22, 2012;
- Payment on October 26, 2012;
- Property inspection on November 26, 2012;
- Payment on November 26, 2012.

(*Id.* ¶ 57.)  The property inspections were reflected in Plaintiff's monthly statements as "AUTO PPTY INSPEC," (*see, e.g.*, *id.* ¶ 57(b) (internal quotation marks omitted)), and Plaintiff was charged $12.50 for each inspection, (*see, e.g.*, *id.*).  The inspections were performed by third-party property preservation vendors and consisted of drive-by inspections of the co-op.  (*Id.* ¶ 66.)  Plaintiff alleges that the inspections were unnecessary because many of the inspections were conducted 30 days or less after Plaintiff made a mortgage payment, indicating that Plaintiff did not abandon the co-op.  (*Id.* ¶ 58; *see also id.* ¶ 65 (alleging that Plaintiff was in "constant contact" with PHH, which eventually took over servicing Plaintiff's mortgage); *id.* ¶ 66 (alleging that PHH knew that Plaintiff was occupying the co-op).)  The inspections were allegedly useless because the drive-by inspections revealed little about the state of Plaintiff's co-op, which is located on the third floor of an apartment building that does not permit public access to outsiders.  (*Id.* ¶ 67.)

Plaintiff has been unable to make a mortgage payment since November 26, 2012.  (*Id.* ¶ 59.)  From November 26, 2012, to May 2015, Plaintiff's co-op was inspected 30 times.  (*Id.* ¶ 60.)  The fees associated with these inspections were again reflected in Plaintiff's monthly statements as "AUTO PPTY INSPEC," and Plaintiff was billed $12.50 for some of the inspections, but $11.25 for most of them.  (*Id.* (internal quotation marks omitted).)  On average, Plaintiff's co-op was inspected once a month.[3]  During this same period of time, Plaintiff was charged for 9 BPOs.  (*Id.* ¶ 61.)  These charges were reflected on Plaintiff's monthly statements as "BPOO Brokers Opinion," "BPOO FLIP," and "BPO Cost," and Plaintiff was billed amounts

---

[3] Plaintiff's co-op was inspected twice in the months of March and May 2015.  (Am. Compl. ¶¶ 60(aa)–(dd).)  In May, the co-op was inspected on the 18th and then again on the 22nd.  (*Id.* ¶¶ 60(cc)–(dd).)

ranging from $85 to $110 each time.  (*Id.* (internal quotation marks omitted).)  Plaintiff alleges

that she paid some of the fees associated with the property inspections and BPOs.  (*Id.* ¶ 70.)[4]

### 3.  Claims Asserted

Plaintiff asserts five causes of action.  First, Plaintiff alleges that Defendants, the property

preservation vendors, and the real estate agents who conducted the BPOs violated RICO

§ 1962(c) by joining together to form a RICO enterprise, the common purpose of which was to

charge borrowers for unnecessary default-related services.  (*Id.* ¶ 89.)  The enterprise allegedly

used the mails and wires to send to Plaintiff and other class members "deceptive [s]ecurity

[a]greements, mortgage invoices, loan statements, payoff demands, or proofs of claims to

borrowers, to claim payments for charges incurred for property inspections and BPOs that it

knew were unnecessary."  (*Id.* ¶ 96.)  Essentially, Defendants used the mails and wires to

fraudulently represent to borrowers that the property inspections and BPOs were necessary.  (*Id.*)

Moreover, the security agreements "fraudulently concealed and misrepresented" the nature of the

fees that borrowers would be charged in the event of default.  (*Id.* ¶ 97.)  Defendants knew that

they were going to "automatically and repetitively" charge borrowers for property inspections

and BPOs even when such services were unnecessary.  (*Id.*)  Had Plaintiff known about these

fraudulent statements and omissions, she never would have sought a loan from HSBC Mortgage.

(*Id.* ¶ 98.)

Second, Defendants allegedly conspired to violate RICO.  (*Id.* ¶¶ 107–11.)

Third, HSBC Mortgage and PHH allegedly violated New York General Business Law

§ 349, which prohibits the use of deceptive acts or practices in the conduct of any business, by

---

[4] The Court notes that Plaintiff's claim that she paid some of the fees associated with the
BPOs is inconsistent with her allegation that she has not made a loan payment since November
2012.  (*Id.* ¶ 59.)  Plaintiff was not charged for a BPO until December 2012, one month after her
last mortgage payment.  (*Id.* ¶ 61.)

knowingly misrepresenting and intentionally omitting material information regarding the fees borrowers would be charged after they defaulted.  (*Id.* ¶ 118.)  Defendants also acted deceptively by presenting borrowers with security agreements that were misleading with respect to whether Defendants would charge borrowers fees for inspections and BPOs.  (*Id.* ¶ 119.)

Fourth, Defendants allegedly breached the Security Agreement.  Under the terms of the Security Agreement, Defendants are permitted to charge Plaintiff fees only for "any action needed to . . . protect or defend" their security interest in the mortgaged property.  (*Id.* ¶ 124 (internal quotation marks omitted).)  Defendants purportedly breached that provision by charging Plaintiff for property inspections and BPOs that were not needed to protect their security interest in the co-op.  (*Id.* ¶ 125.)

Finally, Plaintiff alleges that Defendants were unjustly enriched by their collection of fees for the unnecessary property inspections and BPOs.  (*Id.* ¶ 136.)

B.  Procedural Background

Plaintiff initiated this Action by filing a Complaint on September 2, 2015.  (Dkt. No. 1.) Plaintiff filed the Amended Complaint on January 29, 2016.  (Dkt. No. 44.)  Pursuant to a memo endorsement, (Dkt. No. 43), Defendants submitted the Motions and their accompanying papers on March 4, 2016, (Dkt. Nos. 46–51).  Plaintiff submitted her opposition papers on April 15, 2016.  (Dkt. No. 54.)  Defendants submitted reply papers on May 13, 2016.  (Dkt. Nos. 61–62.) The Parties thereafter filed a series of letters informing the Court of supplemental authority supporting their respective positions.  (*See* Dkt. Nos. 63–71.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

    B.  Analysis

        1.  RICO Claims

Plaintiff claims that Defendants violated RICO (18 U.S.C. § 1962(c)), and conspired to violate RICO (18 U.S.C. § 1962(d)) by forming an enterprise, the common purpose of which was to charge borrowers fees for unnecessary property inspections and BPOs.

        a.  RICO Claim Under § 1962(c)

In the First Cause of Action, Plaintiff alleges that Defendants violated 18 U.S.C. § 1962(c).[5]  While RICO is to "be liberally construed to effectuate its remedial purposes,"

---

[5] This provision provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (internal quotation marks omitted),

courts have cautioned that, because "the 'mere assertion of a RICO claim has an almost

inevitable stigmatizing effect on those named as defendants, courts should strive to flush out

frivolous RICO allegations at an early stage of the litigation,'" *Katzman v. Victoria's Secret

Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (alterations omitted) (quoting *Figueroa Ruiz v.

Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997); *see also Turner

v. N.Y. Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 167 (E.D.N.Y. 2015) (same).

"A private cause of action under RICO requires that the plaintiff allege: '(1) the

defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property,

and (3) causation of the injury by the defendant's violation.'" *Fertitta v. Knoedler Gallery, LLC*,

No. 14-CV-2259, 2015 WL 374968, at *5 (S.D.N.Y. Jan. 29, 2015) (quoting *Lerner v. Fleet

Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006)).  Turning to the first requirement, to establish a

defendant's violation of 18 U.S.C. § 1962, a plaintiff must allege "the existence of seven

constituent elements: (1) that the defendant (2) through the commission of two or more acts

(3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or

maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect

interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983);

*see also Aronov v. Mersini*, No. 14-CV-7998, 2015 WL 1780164, at *3 (S.D.N.Y. Apr. 20, 2015)

(same).  With regard to the racketeering activity requirement, the statute provides a list of

criminal acts that can constitute predicate acts of racketeering.  *See* 18 U.S.C. § 1961(1)

(defining "racketeering activity").  Mail fraud, under 18 U.S.C. § 1341, and wire fraud, under 18

U.S.C. § 1343, qualify as predicate acts of racketeering activity.  *See id.*

Defendants argue that Plaintiff has not pleaded adequately the existence of a RICO enterprise, predicate racketeering acts with the requisite specificity, or injury to her property.

i.  RICO Enterprise

Plaintiff alleges that Defendants and several property preservation vendors formed an association-in-fact enterprise for the "common purpose of routinely and repeatedly, ordering, conducting, and assessing borrowers' accounts for unnecessary default-related services," i.e., property inspections and BPOs.  (Am. Compl. ¶ 89; *see also id.* ¶ 5 ("Defendants formed an enterprise to institute a uniform practice of assessing fees for unnecessary property inspections and Broker Price Opinions . . . against borrowers' accounts.").  RICO defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "This enumeration of included enterprises is obviously broad, encompassing '*any* . . . group of individuals associated in fact.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (alteration in original) (quoting 18 U.S.C. § 1961(4)).  "An 'association-in-fact' for RICO purposes 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *City of New York v. Chavez*, 944 F. Supp. 2d 260, 269 (S.D.N.Y. 2013) (quoting *Boyle*, 556 U.S. at 945).  "[I]t is apparent" from RICO's text "that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle*, 556 U.S. at 946.  In other words, "an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "[C]ourts in th[e] [Second] Circuit look to the 'hierarchy, organization, and activities' of the

association to determine whether 'its members functioned as a unit.'" *Wood v. Gen. Motors Corp.*, No. 08-CV-5224, 2015 WL 1396437, at *7 (E.D.N.Y. Mar. 25, 2015) (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).

Defendants argue first that Plaintiff has failed to allege that the property preservation vendors and real estate brokers shared a common purpose with the other entities in the putative RICO enterprise. (HSBC Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("HSBC Mem.") 6 (Dkt. No. 47); PHH Mem. of Law in Supp. of Mot. To Dismiss ("PHH Mem.") 7–10 (Dkt. No. 50).) Plaintiff rightly concedes that "the vendors may not have shared [a] common purpose" with Defendants. (Pl.'s Mem. of Law in Opp'n to Mots. To Dismiss ("Pl.'s Opp'n") 14 (Dkt. No. 54).) The vendors' only role in the alleged enterprise was conducting the purportedly unnecessary property inspections and BPOs, but the Amended Complaint lacks a single allegation that the vendors knew that those activities were unnecessary or in breach of contract. (*See* Am. Compl. ¶ 39 (alleging that the computer programs utilized by HSBC Mortgage and PHH "automatically generate[] work orders . . . for property inspections").) Indeed, Plaintiff does not allege that these third-party vendors own or service mortgages, developed the guidelines for imposing the default-related services, ordered any of the services, or invoiced the borrowers for the services they performed. The vendors' only role in the alleged enterprise was responding to the automatically-generated work orders. They had no say in when or how those services would be charged to Plaintiff.

In *Cirino v. Bank of America, N.A.*, No. 13-CV-8829, 2014 WL 9894432 (C.D. Cal. Oct. 1, 2014) ("*Cirino I*"), the court held that allegations similar to Plaintiff's were insufficient to allege a RICO enterprise. The court dismissed the plaintiff's RICO claim because:

> [The] [p]laintiff has not offered any facts showing that [the] [d]efendants' property preservation vendors shared any such common purpose. To the contrary,

the [c]omplaint suggests that [the] [d]efendants were the only entities positioned to have a fraudulent purpose. [The] [d]efendants set the guidelines for the management of their loans. [The] [d]efendants' computer systems follow those guidelines, and automatically order property inspections. [The] [d]efendants allegedly conceal the nature of their property inspection fees by describing them as "fees due." [The] [d]efendants' unnamed property preservation vendors, on the other hand, merely carry out the inspections ordered by [the] [d]efendants, pursuant to their contracts with [the] [d]efendants. Nothing in the [c]omplaint indicates that the property preservation vendors intended to assess unnecessary property inspection fees, or intended to fraudulently conceal the nature of those fees from borrowers.

*Id.* at *10 (citations omitted); *see also Cirino v. Bank of Am., N.A.*, No. 13-CV-8829, 2015 WL 3669078, at *4 (C.D. Cal. Feb. 10, 2015) ("*Cirino II*") ("[The] [p]laintiff has not offered facts that render plausible his theory that the vendors associated with [the] [d]efendants to effectuate this fraud on delinquent borrowers. [The] [p]laintiff does not allege that the vendors were involved in deciding when or why to conduct inspections."). As in *Cirino*, Plaintiff has failed to allege that the property preservation vendors shared a common purpose with Defendants. Her allegations suggest that "the ordering and conducting of unnecessary inspections to defraud borrowers was a solo operation, an operation intended and desired only by Defendants." *Cirino II*, 2015 WL 3669078, at *5.

Plaintiff's failure to allege that the property preservation vendors shared a common purpose with Defendants, however, does not necessitate dismissal of Plaintiff's RICO claim because Defendants overlook key differences between this Action and *Cirino*. Plaintiff alleges in the alternative that Defendants used the property preservation vendors "as instrumentalities to carry out the . . . fraudulent scheme." (Am. Compl. ¶ 91.) Defendants do not dispute that a RICO enterprise can carry out its fraudulent scheme through third-party intermediaries. *See Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1028 (S.D. Iowa 2009) ("Congress clearly intended RICO liability to extend to situations where one entity directs the formation of a RICO

14

enterprise and then makes use of the association to further a pattern of unlawful activity, even where portions of the unlawful activity do not issue directly from the RICO enterprise.  Here, [the] [p]laintiffs allege that [the defendants] conducted the affairs of the enterprise by ordering the property inspections, used its association-in-fact business arrangement with the property inspection vendors to conduct its unlawful practice of imposing excessive fees on the mortgagors, and engaged in mail and wire fraud to collect payments for the enterprise's benefit.").  Moreover, the RICO enterprise alleged here is different from the RICO enterprises alleged in *Cirino I*.[6]  In *Cirino I*, the plaintiff alleged the existence of two RICO enterprises: one enterprise consisting of Bank of America, N.A., and its property preservation vendors (the "Bank of America Enterprise"), and a second enterprise consisting of BAC Home Loans Servicing, LP and its property preservation vendors.  2014 WL 9894432, at *2.  Under those circumstances, the fact that the property preservation vendors did not share a common purpose with Bank of America or BAC Home Loans Servicing was fatal to the plaintiff's claims because the participants in the alleged enterprises did not share a common purpose.  For example, the participants in the Bank of America Enterprise did not share a common purpose because only one of its members knew about the allegedly fraudulent scheme.  Here, Plaintiff alleges that HSBC Bank, HSBC Mortgage, and PHH constitute the RICO enterprise and used the property preservation vendors to facilitate their scheme.  (Am. Compl. ¶ 91.)  Therefore, Defendants' reliance on *Cirino* is misplaced.[7]

---

[6] *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016), relied upon by PHH, is distinguishable on these same grounds.  In *Ray*, the court found that *none* of the participants in the alleged RICO enterprise shared a common purpose.  *See id.* at 1352–55.

[7] PHH's reliance on *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013), and *Stitt v. Citibank, N.A.*, 942 F. Supp. 2d 944 (N.D. Cal. 2013), is similarly misplaced.  The statements PHH quotes from those decisions were directed at the plaintiffs' failure to

Defendants nonetheless argue that Plaintiff must plead a common purpose between Defendants and the property preservation vendors.  (*See* HSBC Defs.' Reply Mem. of Law in Supp. of Mot. To Dismiss ("HSBC Reply") 3 (Dkt. No. 62); PHH Reply Mem. of Law in Supp. of Mot. To Dismiss ("PHH Reply") 1 (Dkt. No. 61) (citing *First Capital*, 385 F.3d at 174; *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F Supp. 2d 444, 451 (S.D.N.Y. 2007)).)  The cases Defendants cite, however, require only that "for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *First Capital*, 385 F.3d at 174 (alteration and internal quotation marks omitted).  Even after removing the property preservation vendors from the RICO enterprise, Plaintiff still alleges that HSBC Bank, HSBC Mortgage, and PHH joined together to form an enterprise and shared a common purpose, i.e., charging homeowners unnecessary fees.  This is sufficient.  *See United States v. London*, 66 F.3d 1227, 1243 (1st Cir. 1995) (noting that "two or more legal entities can form . . . an association-in-fact RICO enterprise" (emphasis omitted)); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) ("[The] [p]laintiffs allege conduct specifically between and among . . . [the] [d]efendants *and* at least one other entity, namely Premiere [Asset Services], which supports the requirement that the enterprise members have 'associated together for a common purpose.'  As stated above, the alleged common purpose here was to limit costs and maximize profits through concealment of marked-up fees.").[8]  The question is thus whether Plaintiff has alleged

---

identify sufficiently the structure of the enterprise rather than the plaintiffs' failure to allege that the property preservation vendors shared a common purpose with the defendants.  (*See* PHH Mem. 10.)

[8] HSBC Defendants argue that *Bias* is inapplicable here because it did not "appl[y] the Second Circuit's requirement that all participants in a RICO enterprise must share a common purpose to engage in a particular fraudulent course of conduct."  (HSBC Reply 3.)  The language

adequately that HSBC Bank, HSBC Mortgage, and PHH shared that common purpose.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (holding that certain entities alleged to be members of a RICO enterprise did not share a common purpose with the other defendants but analyzing whether any of the other defendants shared a common purpose).

PHH argues that Plaintiff has not alleged adequately that the HSBC Defendants and PHH shared a common purpose and that Plaintiff impermissibly groups Defendants together "without differentiating between them or explaining which alleged acts are attributable to which [D]efendant."  (PHH Mem. 10–11.)[9]  PHH's argument that the Amended Complaint impermissibly "lumps" Defendants together fails because, as a general rule, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts [the] defendants that identical claims are asserted against each defendant."  *Hudak v. Berkley Grp., Inc.*, No. 13-CV-89, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014); *see also Harris v. NYU Langone Med.*

---

cited above belies this argument.  In *Bias*, the court specifically found that the participants in the enterprise shared the common purpose of "maximiz[ing] profits through concealment of marked-up fees."  *Bias*, 942 F. Supp. 2d at 941.  Moreover, the plaintiffs alleged that the fees were "unlawfully" marked up.  *Id.* at 925 (internal quotation marks omitted).  Thus, the *Bias* court did find that the RICO enterprise shared a common purpose of engaging in allegedly fraudulent conduct.

[9] PHH argues that, at best, Plaintiff has alleged a hub-and-spokes enterprise with the HSBC Defendants and PHH as the center hub and the property preservation vendors as the independent spokes.  (PHH Mem. 9.)  Courts in the Second Circuit have recognized that allegations of a hub-and-spokes enterprise generally are insufficient to state a RICO claim.  *See, e.g.*, *Chavez*, 944 F. Supp. 2d at 272 ("The insufficiency of hub-and-spokes associations to constitute RICO enterprises has long been recognized." (internal quotation marks omitted)); *see also Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No. 15-CV-3784, 2016 WL 6110565, at *7 (S.D.N.Y. Aug. 4, 2016) ("While not every 'hub-and-spokes' association will necessarily fail to constitute a RICO enterprise, *Boyle* requires allegations of something more than parallel conduct by associates of an alleged enterprise.").  PHH's argument, however, overlooks the fact that Plaintiff alleges that PHH and the HSBC Defendants shared the common purpose of collecting fees for unnecessary property inspections and BPOs.  And in furtherance of that common purpose, HBSC Mortgage and PHH, ordered certain property preservation services.  Thus, Plaintiff has not alleged the type of defective enterprise PHH posits.

*Ctr.*, No. 12-CV-454, 2013 WL 3487032, at *7 (S.D.N.Y. July 9, 2013) ("In order to comply with Rule 8, a complaint should offer specification as to the particular activities by any particular defendant . . . .  Rule 8(a) . . . requires that a complaint against multiple defendants indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants." (alteration and internal quotation marks omitted)), *adopted by* 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013); *Howard v. Mun. Credit Union*, No. 05-CV-7488, 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) ("While Rule 8 does not prohibit 'collective allegations' against multiple defendants . . . , it does require that the allegations be sufficient to put each defendant on notice of what they allegedly did or did not do." (alteration and some internal quotation marks omitted)).  The Amended Complaint, although stating that the allegations pertain to "Defendants" or "Mortgage Defendants," provides enough information to put PHH on notice of its alleged role in servicing Plaintiff's mortgage.

The bigger issue with Plaintiff's Amended Complaint is that the Court strains to discern whether PHH shared a common purpose with the HSBC Defendants.  Plaintiff alleges that HSBC Bank and PHH "entered into a strategic relationship" in 2012, (Am. Compl. ¶ 17), but this is four years after the Security Agreement was executed, (*see* Security Agreement), and over a year after Plaintiff first defaulted on the Mortgage Note, (Am. Compl. ¶ 56).  PHH therefore did not play any role in servicing Plaintiff's mortgage until after the Security Agreement was drafted and executed, after Plaintiff defaulted on the Mortgage Note, and after HSBC Mortgage began billing Plaintiff for the allegedly unnecessary property inspections.  It is possible that PHH associated with the HSBC Defendants beginning in 2012 and agreed to implement the HSBC Defendants' practice of billing Plaintiff for unnecessary fees, but it is also just as possible that PHH took over the servicing of Plaintiff's mortgage without any knowledge that the fees for

18

which Plaintiff was being charged were unnecessary, or even that necessity was a requirement.

Other than the vague allegation that there was a "strategic relationship" between PHH and HSBC

Bank, the relationship between the two companies is not otherwise described with any

specificity.  However, because the Court finds that Plaintiff's RICO allegations are deficient for

reasons explained below, the Court will assume without deciding that Plaintiff has alleged

adequately that the Defendants shared a common purpose.

### ii.  Predicate Acts of Mail and Wire Fraud

Defendants argue next that the Amended Complaint fails to satisfy Rule 9(b)'s

heightened pleading standard, which requires a plaintiff "alleging fraud" to "state with

particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "[A]ll allegations of

fraudulent predicate acts[] are subject to the heightened pleading requirements of [Rule 9(b)]."

*First Capital*, 385 F.3d at 178.  This includes allegations of predicate acts of mail and wire fraud.

*See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184–85 (2d Cir. 2008) (holding

that the plaintiffs' mail and wire fraud allegations were not "pled with the requisite particularity"

under Rule 9(b)).

"The essential elements of a mail or wire fraud violation are (1) a scheme to defraud,

(2) money or property as the object of the scheme, and (3) use of the mails or wires to further the

scheme."  *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks

omitted).  In general, "[p]laintiffs must plead . . . mail [or wire] fraud with particularity, and

establish that the [communications] were in furtherance of a fraudulent scheme."  *Lundy v.

Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).  This normally

requires that "[a]llegations of predicate mail and wire fraud acts . . . state the contents of the

communications, who was involved, and where and when they took place, and should explain

why they were fraudulent." *Spool*, 520 F.3d at 185 (alterations and internal quotation marks

omitted). However, courts in the Second Circuit have applied a different standard in cases where

"[a] plaintiff claims that . . . mails or wires were simply used in furtherance of a master plan to

defraud," but does not allege that "the communications [themselves] . . . contained false or

misleading information." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

In such cases, including "complex civil RICO actions involving multiple defendants, . . . Rule

9(b) does not require that the temporal or geographic particulars of each mailing or wire

transmission made in furtherance of the fraudulent scheme be stated with particularity." *Id.*

Instead, "Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the

body of the complaint, the specific circumstances constituting the overall fraudulent scheme."

*Id.*; *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d

153, 177 (E.D.N.Y. 2010) ("[I]n cases where plaintiffs allege that the mails or wires were simply

used in furtherance of a master plan to defraud, the mailings need not contain fraudulent

information, and a detailed description of the underlying scheme and the connection therewith of

the mail and/or wire communications is sufficient to satisfy Rule 9(b)." (internal quotation marks

omitted)), *aff'd*, 442 F. App'x 582 (2d Cir. 2011); *Am. Med. Ass'n v. United Healthcare Corp.*,

588 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) ("Allegations said to be in furtherance of fraud are

held to a different pleading standard entirely."); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d

612, 624 (S.D.N.Y. 2006) ("[W]here the plaintiff claims that the mail or wires were simply used

in furtherance of a scheme to defraud, the complaint need not be specific as to each allegation of

mail or wire fraud as long as the nature of the RICO scheme is sufficiently pleaded so as to give

notice to the defendants." (internal quotation marks omitted)). As one court has explained,

> [t]he rationale for this approach is twofold: one, mailings made only in
> furtherance of a scheme are not technically allegations of fraud within the

20

> meaning of Rule 9(b); and two, the very purpose of applying Rule 9(b) to
> mailings in furtherance of the scheme is obviated where a plaintiff alleges the
> wider scheme with the requisite particularity.

*Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 88 (E.D.N.Y. 2011).

Plaintiff argues that she has pleaded mail and wire fraud in satisfaction of Rule 9(b) because she "alleges that Defendants deceptively represented, using the mails and wires, that they would charge for only []necessary fees but failed to disclose, both in the Security Agreement and the mortgage statements, or otherwise, that they also charge for unnecessary inspections and BPOs."  (Pl.'s Opp'n 23.)  In particular, Plaintiff alleges:

> Through the mail and wire, the HSBC Enterprise provided borrowers like Plaintiff
> with deceptive Security Agreements, mortgage invoices, loan statements, payoff
> demands, or proofs of claims to borrowers, to claim payments for charges
> incurred for property inspections and BPOs that it knew were unnecessary to
> protect HSBC Mortgage's interest in the property, and notwithstanding such
> knowledge, fraudulently represented to [Plaintiff] that such services were
> necessary.  [HSBC Mortgage and PHH] also accepted payments and engaged in
> other correspondence in furtherance of their scheme through the mail and wire.

(Am. Compl. ¶ 96; *see also id.* ¶ 97 ("As part of the fraudulent scheme to take advantage of defaulting borrowers and profit at their expense, the Security Agreements, mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed and misrepresented the true nature and extent of assessments made on borrowers' accounts as well as the actions Defendants would take in the event of a default.").)  These allegations, however, do not satisfy Rule 9(b) because Plaintiff has failed to identify any fraudulent misrepresentations in these communications.

In the event of a default, the Security Agreement allows HSBC Mortgage to take any action it "may have by law."  (Security Agreement 5.)  HSBC Mortgage also is entitled to "take any action needed . . . to protect or defend [its] [s]ecurity" and bill Plaintiff for services rendered. (*Id.* at 6.)  After Plaintiff defaulted, Defendants ordered the third-party property preservation

vendors and real estate agents to perform a series of property inspections and BPOs on Plaintiff's co-op.  (*See, e.g.*, Am. Compl. ¶¶ 57, 61.)  Plaintiff was then billed for those services, as is reflected in monthly billing statements sent to her.  (*See* Mortgage Statements.)  Plaintiff has not identified a single fraudulent misrepresentation in any of these communications or argued that Defendants were prohibited by law from ordering the inspections and BPOs.  *Cf. In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1323, 1330 (S.D. Fla. 2011) ("At best, [the] [p]laintiffs allege mail and wire fraud occur where accurate account statements are mailed to customers and customers are given access [to] account information on [the defendant's] website.  Such cannot be the basis for a RICO claim.").[10]  For example, Plaintiff does not allege that the billing statements reflected over-charges, where Plaintiff was made to pay for inspections that were not done, or that Defendants paid less for these services than what Defendants were charged by those who performed the services.  Nor is there a claim that the itemized listing of the services provided in the billing statements mislabeled the services that were actually provided.

Perhaps realizing this shortcoming, Plaintiff argues that Defendants committed fraud by omitting a material fact, i.e., failing to disclose that the assessed fees were unnecessary.  (Pl.'s Opp'n 24–25.)  In other words, Plaintiff contends that Defendants should have disclosed that they were breaching the Security Agreement by performing services that were unnecessary.  The court in *Vega v. Ocwen Financial Corp.*, No. 14-CV-4408, 2015 WL 1383241 (C.D. Cal. Mar.

---

[10] Plaintiff contends that the billing statements were deceptive because they disclosed the fees using phrases such as "Assessed Expense – BPO COST" and "Auto PPTY Inspection Assessed," (Pl.'s Opp'n 25 n.26 (internal quotation marks omitted)), but the Court finds these disclosures adequate.  Plaintiff's purported lack of understanding of these charges as described does not render them deceptive.  If Plaintiff did not understand the content of the billing statements she received, she was directed to contact HSBC Bank with any questions.  (*See* Mortgage Statements.)

24, 2015) (*Vega I*), rejected a similar argument for reasons the Court finds persuasive.[11]  In *Vega I*, the plaintiff's "theory of wrongdoing [was] based on [the defendant's] failure to disclose that the imposed [property inspection] fees were 'unnecessary.'"  *Id.* at *6.  The court rejected this fraud-by-omission argument because:

> [The plaintiff's] entire grievance with [the defendant] is a basic contract dispute.  [The plaintiff's] mortgage agreement explicitly authorizes property inspections and her monthly bill while she was in default disclosed that she was charged for such inspections.  While there may be a *disagreement* regarding the terms in the mortgage agreement, and whether the property inspections were "reasonable" under the mortgage agreement, a mere disagreement does not create additional liability.  The failure to concede liability in a billing statement does not then create additional causes of action.  It would be absurd for [the defendant] to print "unnecessary property inspection" on each billing statement.   There is no wrongdoing in [the plaintiff's] billing statement because [the defendant] did not concede breach of contract liability.

*Id.*  On this ground, the court dismissed the plaintiff's RICO claim.  *See id.* at *13.

The Court finds Plaintiff's fraud-by-omission theory to be unavailing for these same reasons.  At its heart, Plaintiff's RICO claim boils down to a breach of contract claim.  She contends that the "any action needed" language contained in the Security Agreement implies that homeowners cannot be charged for fees unless the services rendered are "necessary."  This is indeed a fair interpretation of the Security Agreement.  Thus, if Defendants charged for unnecessary services, they could be deemed to be in breach of the Security Agreement.  Courts have cautioned, however, that a breach of contract normally does not constitute the predicate act of mail or wire fraud, or any predicate act for that matter.  *See Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) ("The plaintiffs' mail and wire fraud

---

[11] In *Vega I*, the court dismissed the plaintiff's complaint without prejudice.  *See* 2015 WL 1383241, at *16.  The plaintiff filed an amended pleading, which the court then dismissed with prejudice.  *See Vega v. Ocwen Fin. Corp.*, No. 14-CV-4408, 2015 WL 3441930 (C.D. Cal. May 28, 2015).  On appeal, the Ninth Circuit affirmed the dismissal of the plaintiff's putative class action.  *See Vega v. Ocwen Fin. Corp.*, — F. App'x —, 2017 WL 603861 (9th Cir. Feb. 15, 2017).

allegations 'are nothing more than breach of contract claims, and therefore do not constitute predicate acts.'" (quoting *Lefkowitz v. Reissman*, No. 12-CV-8703, 2014 WL 925410, at *3 (S.D.N.Y. Mar. 7, 2014));  *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12-CV-8205, 2013 WL 3943267, at *5–6 (S.D.N.Y. July 31, 2013) (noting that "frivolous RICO allegations are often manifested in the form of garden variety fraud or breach of contract cases" and dismissing the RICO claim because the plaintiff's allegations "reveal[ed] that th[e] case [was] nothing more than a commonplace business dispute" (internal quotation marks omitted)); *Continental Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-CV-7801, 2012 WL 1856474, at *4 (S.D.N.Y. May 22, 2012) (holding that the plaintiffs "fail[ed] to plead facts sufficient to show that [the] defendants engaged in fraudulent acts so as to establish RICO predicates sounding in fraud," because "[s]imply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim" (internal quotation marks omitted)); *see also U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) ("[A] contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution.  Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud."); *Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir. 2010) ("[A] breach of contract claim . . . cannot be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal."); *Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 12 (1st Cir. 2007) ("[B]reach of contract itself does not constitute a scheme to defraud.  Rather, the scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." (emphasis,

24

alteration, and internal quotation marks omitted)).  Thus, Defendants did not commit mail or wire fraud by declining to disclose that they were charging Plaintiff for services allegedly in breach of the Security Agreement.

Plaintiff attempts to distinguish *Vega I* on the ground that the contract at issue there permitted property inspections that were "reasonable or appropriate," while the Security Agreement permits only inspections that are "needed" or "necessary."  (Pl.'s Opp'n 27.)  The Court acknowledges this difference, but does not place as much weight on it as does Plaintiff. Put simply, replacing "reasonable" or "appropriate" with "needed" or "necessary" does not change the fact that Plaintiff, like the plaintiff in *Vega I*, is complaining that Defendants breached the contract because they charged her for services that were not called for by the contract.  The fact remains that Plaintiff is alleging what amounts to a breach of contract claim, and Defendants did not commit fraud by declining to acknowledge that alleged breach.  No more persuasive is Plaintiff's claim that Defendants "automatically charged unnecessary inspection fees," (*id.*), because even a "willful and intentional" breach of contract does not constitute fraud, *O'Donnell*, 822 F.3d at 662.

Plaintiff argues that *O'Donnell* is of little value because she "alleges that at the time she executed her Security Agreement, the counter-party to that agreement with whom Plaintiff has alleged PHH formed a RICO enterprise, did not intend to abide by the contractual requirement that all charges be for necessary services."  (Letter from D. Greg Blankinship, Esq., to Court (June 27, 2016) 2 (Dkt. No. 64).)  Plaintiff's argument is likely based on the Second Circuit's statement that a contractual promise "can . . . support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution."  *O'Donnell*, 822 F.3d at 662. The Second Circuit explained that the "[f]ailure to comply with a contractual obligation is only

fraudulent when the promisor *never intended* to honor the contract." *Id.* at 660 (internal

quotation marks omitted).  Plaintiff broadly alleges that Defendants "breached their duty of good

faith and fair dealing by entering into a security agreement with Plaintiff . . . in bad faith, i.e.,

knowing in advance that they would order unnecessary automatic and repetitive property

inspections and BPOs."  (Am. Compl. ¶ 127; *see also id.* ¶ 97 ("Although Defendants knew full

well that property inspections and BPOs were automatically and repetitively performed upon a

borrower's default regardless of necessity, the Security Agreement concealed from [Plaintiff] the

fact that she would be charged, let alone automatically and repetitively, for those services as a

consequence of default.").)  The Court must therefore examine whether Plaintiff has alleged any

facts to support this conclusory allegation.  *See Bejjani v. Manhattan Sheraton Corp.*, No. 12-

CV-6618, 2013 WL 3237845, at *15 (S.D.N.Y. June 27, 2013) ("[T]he bare and conclusory

allegation that [one defendant] manifested bad faith by conspiring with [another defendant] does

not rise above *Twombly*'s plausibility threshold.  *Twombly* requires more than a charge that

something bad happened and a conclusory allegation that this bad thing was also illegal because

it resulted from a malevolent conspiracy."), *aff'd*, 567 F. App'x 60 (2d Cir. 2014); *see also*

*Ferguson v. Lion Hold, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) ("To prove a violation of

the implied covenant of good faith and fair dealing, conclusory allegations of a party's failure to

act in good faith alone are insufficient; specific factual allegations of a party's bad faith acts are

required."), *reconsideration granted in part*, 2007 WL 2265579 (S.D.N.Y. Aug. 6, 2007).

     The Amended Complaint does not contain a single allegation about the HSBC

Defendants' intent or knowledge at the time Plaintiff executed the Security Agreement in

December 2008.  Nor does Plaintiff allege that the HSBC Defendants were utilizing a computer

system in 2008 to manage their portfolio of loans.  Instead, Plaintiff alleges that the software

programs were "designed by the executives at HSBC Mortgage and PHH Mortgage," (Am. Compl. ¶ 26), suggesting that the automated system was not developed until 2012 when PHH came on the scene.  The Court acknowledges that Plaintiff was charged for property inspections in 2011, (*id.* ¶ 57), which means that HSBC Mortgage *may* have been utilizing an automated system earlier than 2012.  Even assuming that HSBC Mortgage was utilizing an automated system to service its mortgages in 2008, Plaintiff's argument that HSBC Mortgage never intended to comply with the terms of the Security Agreement is unsupported by plausible factual allegations in the Amended Complaint.  *See Integra FX3X Fund, L.P. v. Deutsche Bank, AG*, No. 14-CV-8400, 2016 WL 1169514, at *3 (S.D.N.Y. Mar. 22, 2016) (holding that even if the complaint contained a claim that the defendant breached the implied covenant of good faith and fair dealing, the complaint's "conclusory allegations of bad faith fail[ed] to meet the high bar to state a claim").  Indeed, Plaintiff's allegations amount only to a claim that some of the automated expenses were bound to be unnecessary, not that HSBC Mortgage knew they were unnecessary and that HSBC Mortgage knew that it was lying to homeowners.  To overcome this deficiency, Plaintiff relies on the fact that HSBC Mortgage allegedly breached the Security Agreement to bolster her argument that HSBC Mortgage never intended to comply with the Security Agreement's terms, (*see* Letter from D. Greg Blankinship, Esq., to Court (Mar. 23, 2017) 3 (Dkt. No. 70) ("[T]he allegation that inspections were ordered automatically solely on the basis that Plaintiff was in arrears . . . supports an inference of fraud in this case because such inspections do not consider Plaintiff's specific circumstances and are, thus, unnecessary."), but Plaintiff's reliance is misplaced.  *See O'Donnell*, 822 F.3d at 559 ("That proof that a promise was made and that it was not fulfilled is sufficient to prove fraud is not, and has never been, a correct statement of the law." (alterations and internal quotation marks omitted)).  At best, Plaintiff alleges that she

and HSBC Mortgage had different understandings as to what actions HSBC Mortgage could take in the event of default.  But Plaintiff's mere disagreement with Defendants' interpretation of the Security Agreement does not render plausible Plaintiff's contention that HSBC Mortgage executed the Security Agreement knowing it would never comply with the terms of that contract. *See Liston-Smith v. Casa Fire & Cas. Ins. Co.*, No. 16-CV-510, 2016 WL 6246300, at *3 (D. Conn. Oct. 25, 2016) ("[T]he plaintiffs allege that [the defendant] sought out policy provisions that allowed it to deny benefits and interpreted those provisions unreasonably in bad faith. However, [the] plaintiffs' allegations only support the inference that they disagree with [the defendant] in the interpretation of their contract.  Nothing in the [c]omplaint provides the court with allegations that plausibly support an inference that [the defendant] acted in bad faith or with a sinister motive."); *Bravo v. MERSCORP, Inc.*, No. 12-CV-884, 2013 WL 1652325, at *7 (E.D.N.Y. Apr. 16, 2013) ("Disagreements as to the meaning of contract language are properly resolved as matters of contract law, not as tort claims for fraud.  Moreover, nowhere does [the] plaintiff present facts supporting an inference that any defendant intended to defraud him. Complex contract language that seems inscrutable or misleading to a layperson will not suffice." (citation omitted)).

Even if Plaintiff's allegations are sufficient to support the assertion of a claim for fraud against HSBC Mortgage—the only Defendant to have signed the Security Agreement—they cannot be used to turn that claim into a RICO claim against PHH for the simple reason that PHH did not enter into the alleged scheme until almost four years after Plaintiff and HSBC Mortgage executed the Security Agreement.  (*See* Am. Compl. ¶ 17 ("In or about 2012, HSBC Bank entered into a strategic relationship with PHH Mortgage . . . ."); *id.* ¶ 55 ("On or about December 22, 2008, Plaintiff . . . purchased a cooperative apartment . . . and entered into a security

agreement with HSBC Mortgage . . . .").)  The Security Agreement was not executed in furtherance of the alleged RICO scheme because the RICO enterprise did not exist until several years later.  The timeline of events is thus fatal to Plaintiff's claim that the consummation of the Security Agreement was in furtherance of a fraudulent scheme to charge borrowers unwarranted fees.

Plaintiff cites to *Young* and *Bias* to argue that "courts have held that similar allegations in nearly identical property inspection fee schemes constituted wire and mail fraud."  (Pl.'s Opp'n 26, 27 n.27.)  But these cases are easily distinguished.  In *Young*, the court determined that the plaintiffs stated a RICO claim because it was plausible that the defendants "acted with knowing intention when *charging mortgagors excessive servicing fees and concealed the nature of those fees* in . . . monthly statements."  671 F. Supp. 2d at 1039 (emphasis added).  The inspection fees were allegedly misrepresented as "other charges" on the billing statements.  *Id.* at 1013 (internal quotation marks omitted).  Here, Plaintiff has not alleged that Defendants misrepresented the fees as "other charges."  *Cf. Vega I*, 2015 WL 1383241, at *12 (distinguishing *Young* on this same ground).  Indeed, the fees were disclosed to Plaintiff in monthly statements as "AUTO PPTY INSPEC" and "BPO Cost."  (Am. Compl. ¶¶ 57, 61 (internal quotation marks omitted).) Plaintiff merely alleges that she should not have been charged for all of the property inspections and BPOs, not that she was misled about the nature of the expenses.  Likewise, in *Bias*, the plaintiff alleged that the defendants engaged in a fraudulent scheme to charge homeowners inspection fees that were "significantly marked-up" from the costs of those services.  942 F. Supp. 2d at 923 (internal quotation marks omitted).  And then when asked to substantiate the charges, the defendants directed a third-party to create fictitious invoices.  *Id.* at 939.  Plaintiff makes no similar allegations here.

29

Plaintiff contends finally that even if the communications sent to homeowners through the mails and wires did not contain any fraudulent misrepresentations or omissions, the communications were nonetheless made "in furtherance" of the fraudulent scheme.  (Pl.'s Opp'n 23–24.)  This argument fails for the same reasons discussed above.  Plaintiff has not pleaded a plausible factual basis upon which to conclude that the Defendants were engaged in a scheme to defraud homeowners.

In sum, the gravamen of Plaintiff's RICO claim is that HSBC Mortgage breached the Security Agreement by charging homeowners fees for unnecessary property inspections and BPOs.  This conduct, however, does not amount to a RICO violation.  Defendants did not misrepresent the nature of the fees in any billing statements, and Plaintiff does not allege that Defendants charged borrowers any amount in excess of the cost of the inspections and BPOs.  Plaintiff has thus failed to allege any actionable predicate acts.  Accordingly, Plaintiff's RICO claim is dismissed on this ground.

### iii.  Injury to Plaintiff's Property

Defendants contend also that Plaintiff's RICO claim must be dismissed because she has not alleged an injury resulting from the enterprise's fraudulent scheme.  To bring a suit under RICO, a plaintiff must allege injury to his or her business or property.  18 U.S.C. § 1964(c).  The plaintiff "must allege *actual*, quantifiable injury," *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014) (internal quotation marks omitted), and the loss alleged must be "clear and definite," rather than speculative, *Am. Home Mortg. Corp. v. UM Sec. Corp.*, No. 05-CV-2279, 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007) (internal quotation marks omitted)); *see also World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 520 (S.D.N.Y. 2007) ("[The] [d]efendants are correct in asserting that a RICO plaintiff may not recover for

30

speculative losses or where the amount of damages is unprovable." (internal quotation marks omitted)), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

HSBC Defendants argue that "the amount Plaintiff allegedly was overcharged is vastly exceeded by the amount that Plaintiff admittedly owed on her loan but failed to pay." (HSBC Reply 8.) This argument, however, is meritless. Even if Plaintiff paid only $1 in unnecessary or fraudulent fees, she suffered an injury to her property, even if it is a minor set-off on what Plaintiff owed on her mortgage. That injury is clear and definite because the finder of fact could reference Plaintiff's billing statements to determine the amount Plaintiff paid in fraudulent fees to Defendants.

PHH argues that Plaintiff has not suffered an injury to her property since November 2012 because Plaintiff has not made a mortgage payment since that time. It also contends that Plaintiff did not suffer an injury before November 2012 because Plaintiff did not actually pay any of the fees assessed on her property. According to PHH, the Mortgage Note directs that payments received from borrowers are first applied to interest and principal and then applied to fees. (PHH Mem. 15.)[12] Because Plaintiff missed several mortgage payments, PHH argues any payments were fully consumed by interest and principal. (*Id.*) Plaintiff, however, alleges she "paid unlawful fees for property inspections and BPOs." (Am. Compl. ¶ 70; *see also id.* ¶ 126.)[13] The Court must accept this allegation as true at this stage of the litigation. *See*

---

[12] PHH cites to ¶ 3 of the Mortgage Note to support its contention that fees are paid after interest and principal. Nowhere in ¶ 3 does the Mortgage Note dictate the sequence in which payments will be applied to fees. As relevant here, it states: "Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal." (Mortgage Note ¶ 3.)

[13] As already noted, Plaintiff's allegation that she paid some of the fees associated with the BPOs for which she was charged is contradicted by other allegations. Plaintiff was not charged for a BPO until approximately one month after she made her last mortgage payment.

*Erickson*, 551 U.S. at 94.  PHH's disagreement with Plaintiff's factual allegations notwithstanding, Plaintiff has alleged an injury to her property.  The Court thus declines to dismiss Plaintiff's RICO claim on this ground.

### b.  RICO Conspiracy

Plaintiff also brings a RICO conspiracy claim under 18 U.S.C. § 1962(d).  This section provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  However, because Plaintiff has not adequately pleaded a substantive RICO violation, "the conspiracy claim under § 1962(d) also fails."  *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 363 (S.D.N.Y. 2014); *see also First Capital*, 385 F.3d at 182 ("[B]ecause [the] [p]laintiffs did not adequately allege a substantive violation of RICO in [c]ount [f]ive on the part of either [defendant], the [d]istrict [c]ourt properly dismissed [c]ount [s]ix, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d)."); *Reich v. Lopez*, 38 F. Supp. 3d 436, 453 (S.D.N.Y. 2014) ("As [the] [p]laintiffs have not adequately pleaded a substantive RICO violation, their conspiracy claim under 18 U.S.C. § 1962(d) is also dismissed."), *reconsideration denied*, 2015 WL 1632332 (S.D.N.Y. Apr. 13, 2015); *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) ("Case law in [the Second] Circuit confirms that a [§] 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient." (collecting cases)).  And there are no additional allegations with respect to the conspiracy count that Defendants agreed to commit further acts that, had they been carried out, would have satisfied the RICO

---

(Am. Compl. ¶¶ 59, 61.)  It is plausible, however, that Plaintiff paid for some of the property inspections because she was billed for 14 such inspections before she ceased making mortgage payments in November 2012.  (*Id.* ¶¶ 57, 59.)  Also, Plaintiff notes that she could amend her pleadings to support the allegation that she paid the fees associated with the BPOs, (Pl.'s Opp'n 10 n.9), but the Court finds such an amendment unnecessary.

elements that the Court has held were deficient with respect to the substantive RICO count. *See Li Jun An v. Hui Zhang*, No. 13-CV-5064, 2013 WL 6503513, at *11 (S.D.N.Y. Dec. 6, 2013) ("Where 'there is insufficient evidence that the defendants actually committed predicate acts displaying the continuity necessary to support a substantive RICO violation,' and 'no evidence that [the] defendants agreed to perform additional acts that, if committed, would have displayed continuity sufficient to establish a pattern of racketeering activity,' a RICO conspiracy claim must fail." (alteration omitted) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 245 (2d Cir. 1999))); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . ."); *BWP Media USA*, 69 F. Supp. 3d at 363 ("Further, [the] [p]laintiffs have made no additional allegations in pleading a RICO conspiracy claim." (internal quotation marks omitted)).  Therefore, the RICO conspiracy claim is dismissed.

### 2.  New York General Business Law § 349

Plaintiff contends that Defendants violated GBL § 349 because reasonable consumers, after reading the Security Agreement, could be deceived into believing that Defendants would charge them for default-related services only when those services are necessary.  Section 349 proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]," GBL § 349(a), and, further, provides a private right of action to "any person who has been injured by reason of any violation of this section," *id.* § 349(h).  Although "[j]ustifiable reliance by the plaintiff is not an element of [a § 349] claim," *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012), a plaintiff under that statute must ultimately "prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff

suffered injury as a result of the deceptive act," *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611

(N.Y. 2000); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir.

2014) (same).  Nevertheless, at the motion to dismiss stage, "an action under § 349 is not subject

to the pleading-with-particularity requirements of Rule 9(b) . . . , but need only meet the bare-

bones notice-pleading requirements of Rule 8(a)."  *Pelman ex rel. Pelman v. McDonald's Corp.*,

396 F.3d 508, 511 (2d Cir. 2005).

With respect to the second element, "[d]eceptive practices are acts which are dishonest or

misleading in a material respect," and "[d]eceptive acts are defined objectively as acts likely to

mislead a reasonable consumer acting reasonably under the circumstances."  *Spagnola v. Chubb

Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (alteration and internal quotation marks omitted); *see also

Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (explaining that "[t]he New

York Court of Appeals has adopted an objective definition of 'misleading,' under which the

alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the

circumstances'" (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,

N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995))).  "[A] deceptive practice 'need not reach the level of

common-law fraud to be actionable under [§] 349.'"  *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir.

2003) (quoting *Stutman*, 731 N.E.2d at 612)).  However, "a GBL § 349 claim does not lie when

the alleged deceptive practice . . . was a matter explicitly disclosed in and permitted under . . . [a]

written agreement."  *Asimov v. Trident Media Grp.*, *LLC*, No. 654129/2013, 2014 WL 4109705,

at *4 (N.Y. Sup. Ct. Aug. 15, 2014); *see also Gomez-Jimenez v. N.Y. Law School*, 956 N.Y.S.2d

54, 59 (App. Div. 2012) ("[A] party does not violate GBL [§] 349 by simply publishing truthful

information and allowing consumers to make their own assumptions about the nature of the

information."); *Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 363 (App. Div. 1994)

(dismissing § 349 claim alleging that the defendant charged excessive fees because the defendant's "practices [were] fully disclosed prior to the sale of tickets" (emphasis, alteration, and internal quotation marks omitted)).

Omissions also may "form the basis of a GBL [§] 349 claim." *Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *11 (E.D.N.Y. Sept. 25, 2015). But § 349 "surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation," unless of course "the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745.

Plaintiff argues that the billing statements Defendants used to disclose the charges for property inspections and BPOs were deceptive. In particular, Plaintiff is dissatisfied with the abbreviations Defendants used to disclose that she was being charged for BPOs, (*see* Pl.'s Opp'n 32 ("[T]he description of broker price opinions as 'BPO' is deceptive.")), but Plaintiff has not cited a single case—and the Court is aware of none—for the proposition that Defendants cannot use abbreviations in billing statements, especially where, as here, the billing statements explicitly direct homeowners to contact the bank if they have any questions. This is not to say that the use of abbreviations will always be appropriate. But under the circumstances presented here, where the billing statements said, for example, "Assessed Expense – BPO COST," (Mortgage Statements), the Court concludes as a matter of law that no reasonable consumer would be misled by Defendants' billing statements.

Plaintiff argues next that the Security Agreement violates § 349 because no reasonable homeowner would read the Security Agreement to permit property inspections and BPOs in the event of default. (Pl.'s Opp'n 31.) This argument, however, is belied by the Security

35

Agreement.  While property inspections and BPOs are not explicitly listed in the section of the Security Agreement titled "Consequences of Default," the Security Agreement permits HSBC Mortgage "to take *any action* needed" to protect its interest in the mortgaged property and to charge the homeowners for those services.  (Security Agreement 6 (emphasis added).)  In another section, the Security Agreement provides that HSBC Mortgage may inspect Plaintiff's co-op at any reasonable time.  (*Id.* at 3.)  Thus, no reasonable consumer could adopt the reading of the Security Agreement Plaintiff asserts in her papers.

Plaintiff argues that the Security Agreement is also deceptive because a reasonable consumer could read the Security Agreement's language that HSBC Mortgage may "take any action *needed* . . . to protect or defend" its security interest, (Security Agreement 6 (emphasis added)), to imply that inspections and BPOs would not be performed unless they were necessary. Or, at the very least, reasonable consumers could believe that they would not be billed for unnecessary inspections and BPOs.  Moreover, while the Security Agreement discloses that HSBC Mortgage can take any action needed to protect its security, it does not disclose that HSBC Mortgage planned to utilize a computer program under which property inspections would be conducted on an automatic basis "every 20 to 45 days," (Am. Compl. ¶ 43), allegedly resulting in unnecessary property inspections.  Thus, the alleged problem is that HSBC Mortgage instituted an automated system—at some point in time—to order property inspections at regular intervals, even though the Security Agreement authorizes HSBC Mortgage to take only actions needed to protect its interest in the mortgaged premises.  As another court has observed, "[a]n automatic process and a 'necessity' requirement are inherently at odds with one another." *Vega I*, 2015 WL 1383241, at *5.  The fees are eventually disclosed after the inspections and BPOs are conducted, but reasonable consumers would not know at the time they sign an HSBC Mortgage

36

security agreement that they could be charged for such fees despite the fact the services may not be "needed" or necessary, as those terms are traditionally understood.  *Cf. Sands*, 616 N.Y.S.2d at 363 (dismissing § 349 claim because the deceptive practices were "fully disclosed" prior to purchase (emphasis and internal quotation marks omitted)).  At this early stage of the litigation, the Court thus declines to hold as a matter of law that a reasonable consumer could not be misled by the language contained in the Security Agreement.[14]

Plaintiff's GBL claim, however, does not survive against all Defendants.  (*See* PHH Mem. 17 ("This states no claim against PHH because HSBC entered into the Security Agreement with Plaintiff, not PHH.").)  The Court has concluded that Plaintiff has plausibly alleged that the Security Agreement was deceptive, but HSBC Mortgage is the only Defendant that signed that agreement.  (*See* Security Agreement 1.)  HSBC Bank and PHH are not alleged to have had any role in the events surrounding Plaintiff's decision to enter into the Security Agreement with HSBC Mortgage.  Indeed, as noted, Plaintiff alleges that PHH did not enter into a "strategic relationship" with HSBC Bank until 2012, (Am. Compl. ¶ 17), four years after the Security Agreement was executed.  Therefore, Plaintiff's GBL claim is dismissed as against HSBC Bank and PHH with prejudice.[15]

---

[14] Though Plaintiff has alleged that the Security Agreement could mislead a reasonable consumer, it is possible that her GBL claim fails for a reason not raised by Defendants.  With respect to the injury requirement, "[a]lthough a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by [an] alleged breach of contract."  *Spagnola*, 574 F.3d at 74; *see also Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 304 (S.D.N.Y. 2012) ("The loss suffered as a result of [the defendant's] alleged breach of § 349 must be independent of the loss alleged under the breach of contract claim.").  Since the Parties did not raise this issue, the Court declines to dismiss Plaintiff's GBL claim on this basis.

[15] Because the Court has dismissed the GBL claim as against PHH, the Court declines to address PHH's argument that a portion of Plaintiff's GBL claim is time-barred.

### 3.  Breach of Contract

Plaintiff alleges that Defendants breached the Security Agreement by charging her for unnecessary property inspections and BPOs.  The Security Agreement states that it "is governed by federal law, and to the extent not preempted by federal law, the Law of Delaware."  (Security Agreement 6.)  The Parties' submissions assume that Delaware law governs Plaintiff's breach of contract claim.  Therefore, the Court will apply Delaware law.

#### a.  Delaware Contract Law

"[T]o survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."  *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).  "In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions.  Dismissal . . . is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."  *VLIW Tech.*, 840 A.2d at 615 (footnote omitted).  "Ambiguity exists" such that dismissal is improper "when the provisions in controversy are reasonably or fairly susceptible of different interpretations."  *Id.* (internal quotation marks omitted).

Defendants are quick to note that they did not breach the Security Agreement because it allows HSBC Mortgage to take "any" action to protect its security interest.  (HSBC Mem. 15; PHH Mem. 18.)  PHH goes so far as to note that "any" is a "particularly expansive" term.  (PHH Mem. 18.)  Noticeably absent from Defendants' moving papers, however, is a definition for the

38

term "needed" or a discussion as to how that term limits the use of "any."  Indeed, the Security agreement does not say that HSBC Mortgage may "take any action" to protect its security interest; it states that HSBC Mortgage may "take any action *needed*" to protect its interest. (Security Agreement 6 (emphasis added).)  The Security Agreement can plausibly be read to permit HSBC Mortgage to choose how it will protect its security interest, such as by ordering property inspections or BPOs, but also to place a limit on that authority; whatever action HSBC Mortgage chooses must be needed to protect its interest.[16]

Whether Defendants breached the security agreement thus turns on the use of the word "needed."  Plaintiff argues that need implies that something is necessary, which means that it is "of an inevitable nature," "inescapable," or "logically unavoidable."  (Pl.'s Opp'n 4 n.3 (internal quotation marks omitted).)  In response, PHH cites to cases advising that necessary might mean something less demanding.  (PHH Reply 8 (citing *Dunbar & Sullivan Dredging Co. v. State*, 20 N.Y.S.2d 127, 131 (App. Div. 1940) ("The word 'necessary' does not mean absolute and indispensable.")).)  The Court thus finds that the Security Agreement is ambiguous.  Therefore, the Court is in no position to determine whether the property inspections and BPOs ordered on

---

[16] PHH also notes that the Security Agreement permits HSBC Mortgage to inspect Plaintiff's co-op "at any reasonable time."  (Security Agreement 3.)  This argument is misplaced because Plaintiff is not arguing that Defendants did not have the authority to inspect her co-op. Rather, she is arguing that she should not be charged for any unnecessary inspections, including cursory drive-by inspections of a third-floor co-op.  The provision to which PHH cites does not allow HSBC Mortgage to bill Plaintiff if HSBC Mortgage decides to inspect Plaintiff's co-op. HSBC Mortgage's authorization to bill Plaintiff for those services is derived from the section permitting HSBC Mortgage to "take any action needed" to protect its security interest.  (Security Agreement 6.)

Plaintiff's co-op were necessary under any meaning of that term given the facts alleged in the Amended Complaint.[17]

PHH cites to *Walker v. Countrywide Home Loans, Inc.*, 121 Cal. Rptr. 2d 79 (Cal. Ct. App. 2002), in an attempt to reject this conclusion. PHH contends that the court in *Walker* "rejected a lawsuit challenging practices very similar to this one" and found that the "inspections complied with the borrower's contract." (PHH Mem. 19.) The Court strains to see the applicability of *Walker* to Plaintiff's breach of contract claim. First, in *Walker*, the plaintiffs did not assert a breach of contract claim; they asserted violations of various California statutes. Second, and more importantly, nowhere did the court hold that the defendant's practice of conducting home inspections at regular intervals complied with the contract at issue. The court held that the defendant's practice was not unfair, not that it complied with the governing contract. *Walker*, 121 Cal. Rptr. 2d at 1177. The court noted simply that "[i]nspecting property after a default is an action that reasonably may be necessary to protect a lender's security interest." *Id.* Here, Plaintiff alleges that no such necessity existed for every inspection and BPO. Accordingly, the Court declines to dismiss Plaintiff's breach of contract claim on this ground.[18]

HSBC Defendants also argue that Plaintiff's breach of contract claim must be dismissed because she has not identified with which entities she entered into a contractual relationship. (HSBC Mem. 14–15.) This argument is well taken. Plaintiff alleges that she "and Class

---

[17] The Court does note, however, that HSBC Mortgage may face difficulty explaining how conducting a drive-by property inspection on May 18, 2015 and then again on May 22, 2015 was needed to protect its security interest in Plaintiff's third-floor co-op. (*See* Am. Compl. ¶¶ 60(cc)–(dd).)

[18] Defendants also reiterate the argument that Plaintiff has failed to allege any damages resulting from the breach. This argument is rejected for the same reasons stated above. Plaintiff alleges that she paid at least some of the supposedly unnecessary fees. (*See id.* ¶ 70.) The Court must accept this allegation as true.

members entered into a security agreement with *Defendants* pursuant to which *Defendants* agreed to charge only fees for 'any action needed to . . . protect or defend' the security." (Am. Compl. ¶ 124 (emphases added).) "*Defendants*" thereafter "breached the agreement by charging Plaintiff and Class members for property inspections and BPOs that were not needed for that purpose." (*Id.* ¶ 125 (emphasis added).) Plaintiff contends that the breach of contract claim should not be dismissed on this ground because "other paragraphs in the [Amended Complaint] . . . specifically identify the individual Defendants and their role in the scheme by which Defendants breached the agreement with Plaintiff." (Pl.'s Opp'n 40.)

There is no dispute that there is a contract governing the relationship between Plaintiff and at least one Defendant. What is less clear is whether all Defendants can be held liable for that breach. With respect to HSBC Mortgage, Plaintiff's allegations are sufficient to state a claim. The Security Agreement is a contract between Plaintiff and HSBC Mortgage, (Security Agreement 1), and Plaintiff alleges that HSBC Mortgage designed and utilized the computer programs that ordered the automatic property inspections, (*see, e.g.*, Am. Compl. ¶ 29). With respect to HSBC Bank, however, Plaintiff has not alleged that she and it ever entered into a contract. Indeed, HSBC Bank is not a party to the Security Agreement, (*see* Security Agreement 1), and the Mortgage Note was also only between HSBC Mortgage and Plaintiff, (*see* Mortgage Note 1). Therefore, HSBC Bank cannot be held liable for HSBC Mortgage's breach of the Security Agreement. *See O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108, 2011 WL 379300, at *7 (Del. Super. Ct. Jan. 14, 2011) ("Under Delaware law, a parent corporation can only be held liable for the performance of a contract by a wholly-owned subsidiary under extremely limited circumstances."). To the extent that Plaintiff argues that HSBC Bank can be held liable for any role it played in orchestrating the alleged breach, Delaware law forecloses that

argument.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172

(Del. 2002) ("It is a general principle of contract law that only a party to a contract may be sued

for breach of that contract." (internal quotation marks omitted)); *Allen v. El Paso Pipeline GP

Co., LLC*, 113 A.3d 167, 193 (Del. Ch. 2014) ("Delaware law generally does not recognize a

claim for aiding and abetting a breach of contract.").  Accordingly, the breach of contract claim

against HSBC Bank is dismissed with prejudice.

PHH notes several times throughout its papers that PHH did not enter into the Security

Agreement with Plaintiff.  (*See, e.g.*, PHH Mem. 21.)  Nowhere does Plaintiff allege that

Plaintiff and PHH were parties to the Security Agreement or any similar document.  There is

thus no basis upon which to hold PHH liable under a theory of breach of contract.  Accordingly,

the breach of contract claim against PHH is dismissed with prejudice.

### b.  The Voluntary Payment Doctrine

PHH argues that even if Plaintiff has stated a breach of contract claim, the claim must

nonetheless be dismissed because Plaintiff voluntarily paid the fees that she alleges were

unnecessary.  (PHH Mem. 22.)  Under Delaware law, "payment voluntarily made with full

knowledge of the facts cannot be recovered, in the absence of a contract to repay."  *W. Nat. Gas

Co. v. Cities Serv. Gas Co.*, 201 A.2d 164, 169 (Del. 1964).  The voluntary payment doctrine is

generally considered to be an affirmative defense, and a plaintiff is "not required to preemptively

plead facts refuting [it]."  *Spagnola*, 574 F.3d at 73; *see also Reid v. Spazio*, 970 A.2d 176, 183–

84 (Del. 2009) ("Unless it is clear from the face of the complaint that an affirmative defense

exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based

upon an affirmative defense is inappropriate.").  The Court thus declines to dismiss Plaintiff's

breach of contract claim at this stage of the litigation.

### 4.  Unjust Enrichment

Plaintiff alleges an unjust enrichment claim in the alternative to her breach of contract claim.  This claim is asserted on behalf of a New York subclass.  (Am. Compl. ¶ 130.)  To state a claim for unjust enrichment under New York law, a plaintiff must plead that (1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff.  *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014); *see also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (noting that "[t]o prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution," and that the "essence of such a claim is that one party has received money or a benefit at the expense of another" (internal quotation marks omitted)). "[W]hen a valid, enforceable contract exists, courts dismiss unjust enrichment claims because the parties' relationship is said to be governed by the terms of the contract."  *Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131, 2015 WL 1014327, at *6 (E.D.N.Y. Mar. 9, 2015); *see also Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 325 (S.D.N.Y. 2016) ("New York Courts do not allow unjust-enrichment claims when there is a valid contract between the parties governing the subject matter at issue." (internal quotation marks omitted)). Courts do, however, "permit both claims to proceed . . . when the existence of a contract is highly contested."  *Moses*, 2015 WL 1014327, at *6.  There is no dispute that the Security Agreement governs the relationship between Plaintiff and HSBC Mortgage.  Accordingly, Plaintiff's unjust enrichment claim is dismissed without prejudice.[19]

---

[19] As all of the claims against PHH have been dismissed, the Court declines to address PHH's argument that Plaintiff has failed to join a necessary party.

43

## III. Conclusion

For the foregoing reasons, PHH's Motion is granted in full, and the HSBC Defendants' Motion is granted in part and denied in part. The only claims remaining are the breach of contract and GBL claims against HSBC Mortgage.[20]  HSBC Mortgage shall file an Answer within 30 days from the date of this Opinion. The Clerk of Court is direct to terminate the pending Motions, (Dkt. Nos. 46, 49), and dismiss Defendants HSBC Bank and PHH from the case.

SO ORDERED.

DATED:    March **30**, 2017
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[20] As this Court's ruling is grounded on Plaintiff's failure to plead a cause of action, and Plaintiff has already been provided with a second opportunity to do so, Plaintiff's RICO claims are dismissed against all Defendants with prejudice, and Plaintiff's GBL § 349 and breach of contract claims against HSBC Bank and PHH also are dismissed with prejudice. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and internal quotation marks omitted)). Plaintiff's unjust enrichment claim is dismissed without prejudice.